UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
MIKE H. CARMODY,

                        Plaintiff,                             <u>REPORT AND</u>
                                                             <u>RECOMMENDATION</u>

       -against-                                    CV 05-4907 (SJF) (ETB)


VILLAGE OF ROCKVILLE CENTRE,
ROCKVILLE CENTRE POLICE DEPARTMENT,
NASSAU COUNTY CIVIL SERVICE
COMMISSION, JOHN P. MCKEON in his official
and individual capacity, and BRIAN BURKE in his
official and individual capacity,

                           Defendants.
----------------------------------------------------------------------x

TO THE HONORABLE SANDRA J. FEUERSTEIN, UNITED STATES DISTRICT JUDGE:

         Plaintiff, Mike H. Carmody ("plaintiff" or "Carmody"), commenced this action on

October 20, 2005, alleging employment discrimination in violation of Title VII, 42 U.S.C.

§2000e <u>et</u> <u>seq.</u>, Title VI, 42 U.S.C. § 2000d <u>et</u> <u>seq.</u>, 42 U.S.C. §§ 1981 and 1983, the New York

State Human Rights Law, N.Y. Exec. Law § 296 <u>et</u> <u>seq.</u>, as well as breach of contract, pursuant

to New York state law.  Specifically, plaintiff alleges that his employment was terminated in

retaliation for his opposition to discriminatory practices within the Rockville Centre Police

Department.  Before the Court are three separate motions for summary judgment by the

following defendants: (1) the Village of Rockville Centre (the "Village"), the Rockville Centre

Police Department ("RVCPD"), and John P. McKeon ("McKeon") (collectively referred to as

the "Village Defendants"); (2) Sergeant Brian Burke ("Burke"); and, (3) the Nassau County

Civil Service Commission (the "CSC").  For the following reasons, I recommend that the Village

Defendants' and Sergeant Burke's motions be granted in part and denied in part and that the CSC's motion be granted in its entirety.

FACTS

I.     The Parties

Plaintiff is a thirty-five year old white male who was formerly employed as a probationary police officer for the RVCPD.  (Village Def. R. 56.1 Statement ("Village 56.1") ¶¶ 1-2; Def. Burke R. 56.1 Statement ("Burke 56.1") ¶ 1; Def. CSC R. 56.1 Statement ("CSC 56.1") ¶ 1.)

Defendant McKeon was the Commissioner of the RVCPD during plaintiff's employment there and remains in that position today.  (Burke 56.1. ¶ 1; CSC 56.1 ¶¶ 7-8.)

Defendant Burke is a sergeant with the RVCPD.  (Burke 56.1 ¶ 2.)  During plaintiff's employment with the RVCPD, Burke had a general supervisory role with respect to all police officers employed there.  (Burke 56.1 ¶ 2.)  Burke was also plaintiff's direct supervisor from January 15, 2003 until approximately February 15, 2003.  (Burke 56.1 ¶ 3.)  Burke did not have any direct supervision with respect to plaintiff after February 15, 2003.  (Burke 56.1 ¶ 19; Burke Dep. 210-11.)

The Nassau County CSC is an agency responsible for establishing, maintaining and certifying civil service eligibility lists and for verifying that competitive class appointments are made in accordance with New York Civil Service Law.  (CSC 56.1 ¶ 15.)  The CSC consists of three Commissioners, an Executive Director, and specialized divisions, which include the Placement Division.  (CSC 56.1 ¶ 10.)  The Commissioners of the CSC possess sole authority to

determine whether an applicant or candidate may be reinstated to an eligible civil service list. (CSC 56.1 ¶ 16.)

II.    Plaintiff's Employment with the RVCPD

Plaintiff began working for the RVCPD as a probationary police officer on March 22, 2002.  (Village 56.1 ¶ 2; Burke 56.1 ¶ 5; CSC 56.1 ¶ 2.)  Pursuant to the RVCPD Rules and Regulations in effect at the time plaintiff commenced his employment, new police officers were required to complete an eighteen-month probationary period.  (Village 56.1 ¶ 3; Burke 56.1 ¶ 5; CSC 56.1 ¶ 3; CSC Ex. GG.)  Accordingly, plaintiff's probationary period ran from March 2002 to September 2003.[1]  (Village 56.1 ¶ 4; CSC 56.1 ¶ 3.)

On or about May 23, 2002, plaintiff received certain employment-related materials from the RVCPD as part of his training, including the RVCPD Rules and Regulations.  (Village 56.1 ¶ 9; Burke 56.1 ¶ 6.)  Also included in these materials was the RVCPD's non-discrimination, non-harassment and non-retaliation policy, which plaintiff received and was trained on by Sergeant Roby Johnson ("Johnson").  (Village 56.1 ¶ 12; Burke 56.1 ¶ 6; Village Def. Ex. W.)  On October 30, 2003, plaintiff signed a form acknowledging that he had read and understood this policy.  (Village 56.1 ¶ 12; Burke 56.1 ¶ 6; Village Def. Ex. X.)

The Rules and Regulations of the RVCPD in effect during the course of plaintiff's employment permitted the Commissioner to terminate any probationary police officer, without a

_____

[1]  The parties dispute whether plaintiff's probationary period was extended an additional two months, to November 2003, due to an injury that plaintiff suffered in the line of duty in April 2003, which prevented him from returning to work until June 2003.  This factual dispute nonetheless appears to be irrelevant to the within motions.

-3-

hearing, if the "conduct, services, performance of duty, physical condition, or health [of the probationary police officer] be[came]unsatisfactory at any time during the probationary period." (Village 56.1 ¶ 16; Burke 56.1 ¶ 7; Village Def. Ex. U.) The RVCPD Rules and Regulations further provided that probationary police officers who did not complete the probationary period, "may be disciplined or discharged by the Village in its sole discretion without recourse to the grievance and arbitration provisions contained in the contractual agreement between the Village and the Police Benevolent Association." (Village 56.1 ¶ 8; Burke 56.1 ¶ 7; Village Def. Ex. U.) On May 23, 2002, plaintiff acknowledged receiving a copy of the RVCPD Rules and Regulations. (Village Def. Ex. V.)

From March 22, 2002 to January 15, 2003, plaintiff was supervised by Sergeant Charles Gennario ("Gennario"). (Burke 56.1 ¶ 8; McKeon Dep. 20.) On June 19, 2002, plaintiff effected a vehicle stop of an individual named Jerry Zwecher ("Zwecher"), an African-American college student visiting family in the Village. (Village 56.1 ¶ 28.) Plaintiff observed Zwecher make a left hand turn at a red light, at which point he proceeded to follow the vehicle. (Village 56.1 ¶ 28; Village Def. Ex. BB.) When Zwecher's vehicle came to a stop, Zwecher and his three passengers emerged and fled on foot. (Village 56.1 ¶ 28; Village Def. Ex. BB.) Plaintiff pursued the individuals and was able to apprehend Zwecher. (Village 56.1 ¶ 28; Village Def. Ex. BB.) Zwecher initially resisted arrest but plaintiff was ultimately able to subdue him. (Village 56.1 ¶ 28; Village Def. Ex. BB.) However, the other three occupants of the vehicle returned, demanding that plaintiff release Zwecher, and would not desist when instructed to do so by plaintiff. (Village 56.1 ¶ 28; Village Def. Ex. BB.) As a result, plaintiff radioed for assistance, to which Sergeant Roby Johnson responded. (Village 56.1 ¶ 28.) While radioing for

assistance, plaintiff was unable to maintain his hold on Zwecher, at which point Zwecher broke free and fled with the other three occupants of the vehicle. (Village 56.1 ¶ 28; Village Def. Ex. BB.) When Sergeant Johnson arrived, he observed a large crowd cursing and taunting plaintiff. (Village 56.1 ¶ 28; Village Def. Ex. CC.) Johnson instructed plaintiff to return to his patrol car and decided not to pursue Zwecher and the other three individuals. (Village 56.1 ¶ 28; Village Def. Ex. BB, CC.)

Later that night, Zwecher's mother filed a written complaint at the RVCPD, alleging that plaintiff had "grabbed" her son during the traffic stop. (Village 56.1 ¶ 29; Village Def. Ex. DD.) Sergeant Johnson informed Zwecher's mother that her son would need to file any complaint himself. (Village 56.1 ¶ 29; Village Def. Ex CC, DD.)

On June 24, 2002, Zwecher wrote two letters, the first to Village Mayor Eugene Murray and the second to the RVCPD, alleging that on June 19, 2002, he was "a victim of unnecessary use of force and physical aggression" by plaintiff. (Village Def. Ex. EE.) According to Zwecher, while operating his vehicle, he was followed by plaintiff and, concerned that this might be a "profiling situation," took care to signal correctly. (Village 56.1 ¶ 30; Village Def. Ex. EE.) Zwecher alleged that after parking his car, plaintiff approached him and grabbed him by the throat "without any explanation or reason," swinging him by the neck "like some type of dog." (Village 56.1 ¶ 30; Village Def. Ex. EE.) Zwecher further alleged that when he refused to provide plaintiff with his identification, plaintiff continued "swinging" him and cursing at him. (Village 56.1 ¶ 30; Village Def. Ex. EE.) Zwecher demanded that plaintiff be "properly reprimanded." (Village 56.1 ¶ 30; Village Def. Ex. EE.)

Lieutenant Richard Fantry conducted an investigation into Zwecher's allegations.[2] (Village 56.1 ¶ 31; Village Def. Ex. FF, GG.)  However, Zwecher was unwilling to assist in Fantry's investigation, repeatedly ignoring Fantry's requests to provide a formal statement as well as the names and contact information of witnesses to the alleged altercation with plaintiff. (Village Def. Ex. FF.)  On September 11, 2002, Zwecher filed a notice of claim with the Village regarding the June 19, 2002 incident with plaintiff.  (Village 56.1 ¶ 32; Village Def. Ex. HH.)

On September 23, 2002, an individual named Edwina Mooney ("Mooney") wrote to Mayor Murray, complaining that plaintiff and her son, Charles Parsley ("Parsley"), were involved in an altercation earlier that day wherein plaintiff alleged that Parsley spit on his patrol car and "disrespected him."  (Village 56.1 ¶ 37; Village Def. Ex. MM.)  Mooney alleged that plaintiff thereafter "followed [her] son onto [her] property making threatening comments." (Village 56.1 ¶ 37; Village Def. Ex. MM.)  Lieutenant Dennis Marcel investigated Mooney's complaint but despite repeated attempts to interview Mooney, she failed to keep any of her appointments.  (Village 56.1 ¶ 38; Village Def. Ex. NN.)  By memorandum dated October 9, 2002, Marcel advised McKeon that he found no wrongdoing by plaintiff.  (Village 56.1 ¶ 38; Village Def. Ex. NN.)

On November 1, 2002, an individual named Alan Koval ("Koval") also filed a complaint against plaintiff with the RVCPD.  (Village 56.1 ¶ 33; Village Def. Ex. II.)  In his complaint,

---

[2] As part of his investigation, Fantry emailed plaintiff regarding the lack of any notes made by plaintiff concerning the incident as well as the omission of the incident from the police blotter.  (Village Def. Ex. GG.)  Fantry advised plaintiff that "these sort of notes are always important to any investigation, and should have been completed by [plaintiff] after the incident." (Village Def. Ex. GG.)  Fantry cautioned plaintiff that it was "quite probable that this oversight may result in some form of disciplinary report."  (Village Def. Ex. GG.)

Koval alleged that while posting flyers at the Village railroad station on September 30, 2002, he was approached by plaintiff, who was in plain clothes and ordered Koval to stop posting flyers. (Village 56.1 ¶ 33; Village Def. Ex. II.)  Koval further alleged that plaintiff never identified himself as a police officer.  (Village 56.1 ¶ 33; Village Def. Ex. II.)  Koval alleged that as he began to walk away, plaintiff attempted to take the flyers from him and began "pushing and shoving [Koval], practically wrestling [him] to the ground."  (Village 56.1 ¶ 33; Village Def. Ex. II.)  Thereafter, Police Officer Romance approached and identified himself and plaintiff as police officers.  (Village 56.1 ¶ 33; Village Def. Ex. II.)  Koval alleged that he offered to take down the flyers but was issued a desk appearance nonetheless.  (Village 56.1 ¶ 33; Village Def. Ex. II.)  An investigation conducted by Lieutenant Richard Fantry ("Fantry") found that there was no evidence to substantiate Koval's claims and that no disciplinary action against plaintiff was warranted.  (Village 56.1 ¶ 36; Village Def. Ex. LL.)

Due to a change in the structure of shifts within the RVCPD, plaintiff's employment shift was changed on or about January 15, 2003, bringing him under Sergeant Burke's supervision. (Village 56.1 ¶ 39; Burke 56.1 ¶ 11; McKeon Dep. 20.)  Plaintiff worked his first tour under Burke's supervision on or about January 22, 2003.  (Burke 56.1 ¶ 11.)  During that first tour, plaintiff conducted a vehicle stop of Joseph W. DeFelice ("DeFelice") and radioed his location to the desk officer on duty at the time.  (Village 56.1 ¶ 40-41.)  Officer James Giovanello ("Giovanello") heard plaintiff's radio transmission and proceeded to plaintiff's location. (Village 56.1 ¶ 42; Giovanello Dep. 32-33.)  Plaintiff was standing at the door of DeFelice's vehicle when Giovanello arrived.  (Village 56.1 ¶ 42; Giovanello Dep. 34.)  Plaintiff asked DeFelice whether he had been drinking.  (Village 56.1 ¶ 42; Giovanello Dep. 35.)  Plaintiff then

instructed DeFelice to exit the vehicle and walk towards the back of it. (Village 56.1 ¶ 42; Giovanello Dep. 35.) Plaintiff then asked DeFelice to recite the alphabet, which DeFelice was unable to do correctly. (Village 56.1 ¶ 42; Giovanello Dep. 37.) Giovanello did not observe plaintiff conduct any other parts of the standardized field sobriety test on DeFelice - specifically, the walk-and-turn test, the one-legged stand and the horizontal gaze nystagmus.[3] (Village 56.1 ¶ 42; Giovanello Dep. 39, 85, 91-95.)

Sergeants Burke and Johnson also heard plaintiff's radio call regarding his vehicle stop of DeFelice and proceeded to plaintiff's location as well. (Village 56.1 ¶ 43; Burke Dep. 148, 150-51; Johnson Dep. 22.) When they arrived, Burke approached plaintiff, who was sitting in his vehicle, completing paperwork. (Village 56.1 ¶ 43; Burke Dep. 152-54; Johnson Dep. 23-24.) Plaintiff advised Burke that DeFelice had sped past him and that plaintiff was going to issue him a summons. (Village 56.1 ¶ 43; Burke Dep. 154-55.) DeFelice was still in his vehicle at this point and plaintiff had not yet conducted any sobriety tests. (Village 56.1 ¶ 43.) Burke then returned to his vehicle and drove across the street to a parking lot where he and Johnson observed plaintiff conduct the rest of the vehicle stop. (Village 56.1 ¶ 43; Burke Dep. 159; Johnson Dep. 25.) Burke and Johnson observed plaintiff approach DeFelice's vehicle and saw DeFelice exit the vehicle, at which time he was handcuffed by plaintiff.[4] (Village 56.1 ¶ 43; Burke Dep. 165-66; Johnson Dep. 25-27.) Neither Burke nor Johnson observed plaintiff perform

---

[3] Plaintiff disputes this and contends that he conducted the entire standardized field sobriety test on DeFelice, including the specific tests set forth above. (Pl. R. 56.1 Statement ("Pl. 56.1") ¶ 42.)

[4] Plaintiff does not dispute the fact that Burke and Johnson were situated across the street from the vehicle stop that he was conducting but contends that the sergeants did not witness the entire stop. (Pl. 56.1 ¶ 43.)

any of the standardized field sobriety tests.  (Burke Dep. 183-84; Johnson Dep. 27; Burke Reply Ex. A.)

Following DeFelice's arrest, plaintiff completed the Nassau County field sobriety test form.  (Village 56.1 ¶ 44.)  Plaintiff indicated on the form that he conducted the walk-and-turn test, the one-legged-stand and the horizontal gaze nystagmus.  (Village 56.1 ¶ 44; Village Def. Ex. OO.)  Plaintiff also completed the Nassau County D.W.I. Supporting Deposition and Bill of Particulars form with respect to DeFelice's arrest.  (Village 56.1 ¶ 45.)  Under Section four of the form, entitled "Probable Cause to Arrest," plaintiff indicated that he conducted the following field sobriety tests: (1) reciting the alphabet; (2) one leg stand; (3) gaze nystagmus; and, (4) finger to nose.  (Village 56.1 ¶ 45; Village Def. Ex. OO.)  Plaintiff did not check off the box to indicate that he conducted the walk and turn test.[5]  (Village 56.1 ¶ 45; Village Def. Ex. OO.)

Burke reviewed plaintiff's paperwork in connection with the DeFelice vehicle stop and subsequent arrest and submitted it to Lieutenant Dennis Marcel.  (Village 56.1 ¶ 46; Burke Dep. 184.)  However, Burke refused to sign off on plaintiff's paperwork because it indicated that plaintiff performed certain field sobriety tests that Burke did not observe take place.  (Village 56.1 ¶ 46; Burke Dep. 183-84.)  By email dated February 4, 2003, Burke advised Marcel that he had "some concerns" regarding the sobriety field tests indicated to have been conducted in plaintiff's paperwork, such that he was "of the opinion that the testing was not conducted prior to arrest."  (Village Def. Ex. PP.)  According to Burke, he arrived at plaintiff's location approximately four minutes after plaintiff conducted the vehicle stop of DiFelice's automobile,

_____

[5]  Plaintiff agrees that he did not check off the box indicating he performed the walk and turn test but contends that this failure on his part was nothing more than an oversight and that he did in fact perform the test.  (Pl. 56.1 ¶ 45.)

remaining for the duration of the stop, and did not observe the indicated testing having been performed.  (Village Def. Ex. PP.)  As a result, Burke "declined to sign off on the report." (Village Def. Ex. PP.)  Plaintiff was not disciplined in any way in connection with this incident. (McKeon Dep. 131.)

III.    Allegations of Plaintiff's Misconduct and Commissioner McKeon's Investigation

On January 30, 2003 - approximately one to two weeks after becoming plaintiff's direct supervisor - Burke emailed Commissioner McKeon and requested that McKeon "give consideration" to plaintiff's probationary period.  (Village 56.1 ¶ 47; McKeon Dep. 15; Burke Dep. 79-81; Village Def. Ex. QQ.)  In his email, Burke recommended that plaintiff "[did] not meet the appropriate level of standards expected and demanded of a probationary police officer in the [RVCPD]."  (Village Def. Ex. QQ.)  Burke further recommended that plaintiff was "not adequately trained for the patrol function . . . and thus . . . should be removed from independent patrol."  (Village Def. Ex. QQ.)  Burke requested that plaintiff "not be certified upon completion of his probationary period" and that "termination of his employment be strongly considered." (Village Def. Ex. QQ.)  This was the first time McKeon had received any internal complaints[6] regarding plaintiff's conduct.  (McKeon Dep. 49.)

McKeon conducted an investigation into Burke's allegations, which included speaking directly to Burke, Sergeant Johnson and Police Officer Giovanello, who were present during plaintiff's arrest of DeFelice.  (McKeon Dep. 16.)  McKeon also directed Lieutenant Fantry to

---

[6]  Burke testified at his deposition that he would not characterize his email as a "complaint," but rather, as a "recommendation."  (Burke Dep. 97.)

-10-

interview all of the sergeants within the RVCPD regarding their impressions of plaintiff. (Village 56.1 ¶ 48; Burke 56.1 ¶ 16; McKeon Dep. 16.)  In addition, McKeon asked Lieutenant Marcel about the next start date for the Nassau County Police Department Academy.  (Village 56.1 ¶ 48; Village Def. Ex. SS.)

     A.    <u>Sergeant James Vafeades</u>

     By email dated January 30, 2003, Sergeant James Vafeades ("Vafeades") advised Lieutenant Fantry that he had never supervised plaintiff and therefore all of his impressions of plaintiff were formed as a result of working alongside plaintiff when Vafeades was a patrol officer.  (Village 56.1 ¶ 49; Village Def. Ex. TT.)  In Vafeades' opinion, plaintiff had "yet to find his place" in the RVCPD and had not attempted to "fit in."  (Village Def. Ex. TT.)  Vafeades stated that he knew other members of the RVCPD had spoken to plaintiff in an attempt to provide some guidance but that he had overheard plaintiff make remarks about how he was not going to change.  (Village Def. Ex. TT.)  Vafeades also recounted an instance in which he overheard plaintiff remark "just wait for me to get off of probation, they haven't seen anything yet."  (Village Def. Ex. TT.)

Vafeades also stated that he was concerned because other officers had indicated to him that they did not want to work with plaintiff.  (Village Def. Ex. TT.)  However, Vafeades felt that "with some training," plaintiff could "eventually become a productive member of the force." (Village Def. Ex. TT.)  Ultimately, Vafeades stated that he supported the idea of sending plaintiff to the Nassau County Police Academy for training "in an attempt to educate him and help his adaptation to [the RVCPD]."  (Village Def. Ex. TT.)

B.     Sergeant Kenneth Schafer

Sergeant Kenneth Schaefer's ("Schaefer") email, dated January 31, 2003, advised Lieutenant Fantry that although Schaefer had not experienced any problems with plaintiff himself, he "[had] heard negative comments about [plaintiff] from other supervisors and officers."  (Village 56.1 ¶ 50; Village Def. Ex. UU.)  One example Schaefer provided was when he was scheduling DWI enforcement, he was informed by several officers that "they would pass on the overtime if it meant working with [plaintiff]."  (Village Def. Ex. UU.)  Schaefer admitted that his opinion was based on hearsay, but stated that "[i]f even only a small percentage of the incidents [he had heard about] were factual," they presented, "at the very least . . . a training issue with [plaintiff] that need[ed] to be addressed."  (Village Def. Ex. UU.)

C.     Sergeant Kevin P. O'Toole

Sergeant Kevin P. O'Toole's ("O'Toole") email, dated January 31, 2003, detailed his "observations and interactions" with plaintiff.  (Village 56.1 ¶ 51; Village Def. Ex. VV.)  As O'Toole explained in his memo, he first met plaintiff after being informed by plaintiff's father-in-law, Thomas Garrity, that plaintiff was seeking to leave the New York City Police Department and was on the Nassau County civil service list.  (Village 56.1 ¶ 51; Garrity Dep. 30, annexed as Village Def. Ex. L; Village Def. Ex. VV.)  O'Toole met with plaintiff and found that he was "a respectful, eager and intellegent [sic] police officer with an outstanding background with the New York City Police Department."  (Village 56.1 ¶ 51; Village Def. Ex. VV.)  O'Toole submitted plaintiff's resume to McKeon and plaintiff was hired shortly thereafter. (Village 56.1 ¶ 51; Village Def. Ex. VV.)

Although O'Toole's interactions with plaintiff while both were employed with the RVCPD were "limited," O'Toole heard several members of the RVCPD make unfavorable comments "regarding [plaintiff's] attitude and his dealings with the public. (Village 56.1 ¶ 52; Village Def. Ex. VV.) O'Toole's impression of plaintiff changed as well after plaintiff joined the RVCPD, in that O'Toole observed plaintiff be disrespectful to both O'Toole himself as well as other supervisors. (Village Def. Ex. VV.) O'Toole described plaintiff as "outspoken" with a "know it all attitude," which O'Toole found to be a "marked difference" from the other seven New York City Police Department transfers the RVCPD had hired. (Village Def. Ex. VV.)

In addition, O'Toole described an incident that occurred on October 17, 2002, in which plaintiff radioed that he had been involved in a motor vehicle accident. (Village 56.1 ¶ 53; Village Def. Ex. VV.) O'Toole responded to plaintiff's location and observed a significant amount of damage to the left front end of plaintiff's vehicle, which was caused when the vehicle struck a concrete block supporting a light pole. (Village 56.1 ¶ 53; Village Def. Ex. VV.) Plaintiff informed O'Toole that he had swerved in an effort to avoid hitting another vehicle that was backing out of a parking spot and ended up striking the light pole. (Village Def. Ex. VV.) O'Toole stated that, based on his own observations of the scene, plaintiff's version of events "did not appear to be a factual account of the accident." (Village Def. Ex. VV.) Sergeant Gennario arrived at the scene shortly thereafter and, after some discussion, Gennario and O'Toole agreed that the accident was not caused by another vehicle, as plaintiff had advised.

(Village Def. Ex. VV.)  Gennario issued plaintiff a white card[7] for the incident.  (Village 56.1 ¶ 53.)

### D. Lieutenant Glenn Quinn

By email dated January 31, 2003, Lieutenant Glen Quinn ("Quinn") advised Lieutenant Fantry that although he had "limited interaction" with plaintiff in a supervisory capacity, based on his personal interactions with plaintiff, as well as the "rumor mill," he believed that plaintiff's status as a probationary police officer "should be thoroughly evaluated to determine his fitness and qualifications to continue his assigned duties as a permanent employee of the [RVCPD]."  (Village Def. Ex. WW.)  Quinn recounted an incident in which he and plaintiff, as well as two other officers, were assigned to investigate a reported disturbance. (Village Def. Ex. WW.)  Two subjects were arrested for disorderly conducted and processed by plaintiff.  (Village Def. Ex. WW.)  Although one of the subjects was "particularly uncooperative," Quinn stated that he felt that plaintiff's "demeanor during processing was not conducive to expediting arrest processing" and that "at times it seemed as though [plaintiff] was attempting to 'entice' the defendant into taking a swing at him."  (Village Def. Ex. WW.)

Quinn further stated that he had "several sergeants . . . relay to [him] their unease at having [plaintiff] work for them."  (Village Def. Ex. WW.)  Quinn admitted that much of his opinion was based on hearsay but stated that "in [his] opinion," plaintiff was "a bit overzealous during his probationary status and [had] failed to transition from the NYPD to [the RVCPD] smoothly."  (Village Def. Ex. WW.)  According to Quinn, plaintiff's "'confidence' in his

---

[7]  A white card is a notice that an officer engaged in misconduct, which remains in the officer's file for ninety days and is then removed, provided there are no other disciplinary issues with that officer within the ninety days.  (Village 56.1 ¶ 53.)

abilities . . . exceed[ed] his capabilities and knowledge," such that Quinn felt "further training" might be warranted.  (Village Def. Ex. WW.)

     E.    <u>Sergeant Robert W. Bystricky</u>

Sergeant Robert W. Bystricky's ("Bystricky") email, dated February 3, 2003, advised Lieutenant Fantry that although he had "not worked many tours" with plaintiff, his observation was that "at best [plaintiff] does not understand the mission of our department . . . and at worst he doesn't care what it is."  (Village 56.1 ¶ 64; Village Def. Ex. AAA.)  Bystricky went on to state that "[o]therwise, [plaintiff] seem[ed] to be a nice enough person."  (Village Def. Ex. AAA.)

     F.    <u>Sergeant Burke</u>

Burke submitted his email to Lieutenant Fantry on February 4, 2004.  (Village 56.1 ¶ 65; Village Def. Ex. BBB.)  Burke's email mainly described instances of alleged misconduct by plaintiff that were recounted to him by other supervisors.  (Village Def. Ex. BBB.)  However, one incident of which Burke had personal knowledge involved the DWI arrest of DeFelice.  (Village Def. Ex. BBB.)  Burke stated that "[i]n reviewing the arrest package afterward, [he] found a completed S[tandardized] F[ield] S[obriety] T[est] form indicating a number of specific sobriety tests were performed at the scene."  (Village Def. Ex. BBB.)  Burke further stated that he was "at the scene at the time indicated and in direct observation of the arrest," and did not observe any such tests performed."  (Village Def. Ex. BBB.)  Burke concluded that he believed that "the test results were fabricated."  (Village Def. Ex. BBB.)

Burke went on to state that plaintiff "act[ed] in a manner that [was] not consistent with being a rookie officer," such that "his attitude portray[ed] a sense of superiority toward senior

members of [the RVCPD]."  (Village Def. Ex. BBB.)  According to Burke, plaintiff "seem[ed] to have little regard for supervisors" and "[did] not appear to respect authority."  (Village Def. Ex. BBB.)  Burke further stated that plaintiff "[had] shown consistently bad judgment."  (Village Def. Ex. BBB.)  Burke concluded that he did not want to work with plaintiff, nor did he want to supervise him, and that he was "very concerned."  (Village Def. Ex. BBB.)

G.      Sergeant Charles Gennario

By email dated February 6, 2003, Sergeant Gennario advised Lieutenant Fantry that although he considered plaintiff to be "a confident sometimes arrogant officer," he nonetheless "found him to be very competent."  (Village 56.1 ¶ 75; Village Def. Ex. DDD.)  Quite different from the other sergeants' emails, Gennario described plaintiff as a good "street cop" who, in the short time that he had been with the department, "led patrol in arrests." (Village Def. Ex. DDD.)  Gennario further described plaintiff as having a "nose" for police work and an ability to handle "all kinds of assignments well" as well as the ability to "develop[] a good rapport with the civilians he comes into contact with."  (Village Def. Ex. DDD.)  Gennario also stated that plaintiff's "production [had] been excellent" and that he prepared "thorough and efficient reports."  (Village Def. Ex. DDD.)

Gennario recounted one "minor disciplinary infraction" that plaintiff committed in which plaintiff was involved in an accident involving his departmental vehicle.  (Village Def. Ex. DDD.)  According to Gennario, the "real problem" was plaintiff's "cavalier attitude regarding the accident."  (Village Def. Ex. DDD.)  When Gennario instructed plaintiff to photograph the damage to his vehicle, plaintiff placed band-aids over the damaged areas prior to taking the photographs.  (Village Def. Ex. DDD; Burke Dep. 106-07.)  Gennario stated that he issued

plaintiff a white card for the accident "[i]n order to stress the seriousness of the incident."

(Village Def. Ex. DDD.)

Gennario concluded his email by stating that he would "prefer to have [plaintiff] work for

[him] than many of the others that are currently working (or not working)." (Village Def. Ex.

DDD.) In Gennario's opinion, plaintiff "has a great interest in being a cop and does stir the pot

often which will create civilian complaints," but that "[o]ne of [plaintiff's] strong points is that

he can be counselled [sic] and takes criticism well without holding a grudge." (Def. Ex. DDD.)

Gennario stated that he believed that the RVCPD should retain plaintiff and that "other officers

should emulate certain characteristics that he displays." (Village 56.1 ¶ 75; Def. Ex. DDD.)

H.   Sergeant Edward R. Calder

Sergeant Edward R. Calder's ("Calder") memo to Lieutenant Fantry, dated

February 6, 2003, stated that although he had limited interaction with plaintiff, "several incidents

involving [plaintiff] . . . formed a negative impression in [his] mind." (Village 56.1 ¶ 76; Village

Def. Ex. EEE.) Calder stated that the "most serious incident" involved the processing of an

arrest that plaintiff had made. (Village Def. Ex. EEE.) According to Calder, plaintiff made an

arrest, for which Sergeant Gennario set the charges, of which there were five. (Village Def. Ex.

EEE.) When Calder relieved Gennario in the morning, he was informed of the arrest but not the

specific charges. (Village Def. Ex. EEE.) Calder stated in his memo that plaintiff "took it upon

himself to add two [additional] charges without discussing it with [Calder] and against

[Gennario's] wishes." (Village Def. Ex. EEE.) Calder learned of the conflict the following day

from Gennario and "felt that [plaintiff] took advantage of the change in supervision to further his

own agenda and by doing so disobeyed [Gennario] and disrespected [Calder]."  (Village Def. Ex. EEE.)

Calder also recounted a second incident in which plaintiff arrived at headquarters at the end of one of his tours, "threw a license plate onto the service desk and began to walk away." (Village Def. Ex. EEE.)  When Calder questioned plaintiff about the license plate, he stated that he "found it in the projects."  (Village Def. Ex. EEE.)  Calder later learned that plaintiff had removed the license plate from a vehicle parked in the projects because, although the plate was valid, it was on the wrong vehicle.  (Village Def. Ex. EEE.)  Calder stated in his memo that he "verbally reprimanded [plaintiff] and instructed him in the proper paperwork and procedures for such occurrences."  (Village Def. Ex. EEE.)

Calder concluded his memo by stating that "many of the cops are leery of [plaintiff] and don't like to work with him."  (Village Def. Ex. EEE.)  According to Calder, although he found plaintiff to be "intelligent" and "aggressive," he also considered him "untrustworthy, disrespectful to authority, and less than honest."  (Village Def. Ex. EEE.)  Calder's recommendation was that "some retraining [was] necessary, but more importantly a drastic change in attitude [was] essential if [plaintiff were] to thrive in [the RVCPD]."  (Village Def. Ex. EEE.)

On February 7, 2003, Calder submitted a follow-up email, in response to a request from Lieutenant Fantry regarding an alleged incident involving plaintiff's purchase of a barbecue grill while on duty.  (Village 56.1 ¶ 82; Village Def. Ex. FFF.)  In the email, Calder stated that his recollection of the "BBQ Incident" was that he was standing in the parking lot of the RVCPD headquarters when he observed plaintiff enter the lot in his personal automobile.  (Village Def.

Ex. FFF.)  Calder observed a "large outdoor BBQ grille" in the rear of plaintiff's vehicle.

(Village Def. Ex. EEE.)  According to Calder, he "took note that [plaintiff] was on duty at this

time" and a few days later, he "found out" that plaintiff was observed by another officer "loading

the BBQ onto the rear of his truck in the rear of PC Richard in full uniform."  (Village Def. Ex.

EEE.)

I.      Sergeant Roby Johnson

By memorandum dated February 7, 2003, Sergeant Roby Johnson

detailed certain incidents in which plaintiff was involved, including the June 19, 2002 alleged

altercation with Jerry Zwecher, which resulted in a complaint being filed against plaintiff, as

well as the DWI arrest of Joseph DeFelice.  (Village Def. Ex. GGG.)  Like Burke, Johnson stated

that he did not see plaintiff perform the standard field sobriety tests, however, Johnson

acknowledged that plaintiff's patrol car was blocking his view of plaintiff and DeFelice.

(Village Def. Ex. GGG.)  Nonetheless, Johnson further stated that although he "[did] not know

how long it takes to conduct such a test . . . there was a very short period of time between

DeFelice exiting his vehicle and his being arrested."  (Village Def. Ex. GGG.)

Johnson stated in his memo that plaintiff "[was] an aggressive police officer whom

[Johnson] believe[d] need[ed] supervision."  (Village Def. Ex. GGG.)  However, Johnson also

stated that he believes it is the supervisors' responsibility to "correct any shortcomings" that they

observed in plaintiff, which Johnson maintained he had consistently done.  (Village Def. Ex.

GG.)  Johnson concluded that he believed that "possible training or retraining of an officer is

preferable to termination."  (Village Def. Ex. GGG.)

After interviewing all of the sergeants within the RVCPD concerning their impressions of plaintiff, Lieutenant Fantry presented Commissioner McKeon with his findings by memorandum dated February 7, 2003. (Village 56.1 ¶ 90; Village Def. Ex. HHH.) Fantry attached to his memorandum all of the written reports provided to him by the sergeants. (Village 56.1 ¶ 90; Village Def. Ex. HHH.) Fantry noted that the only supervisor who demonstrated "strong support" for plaintiff's abilities as a police officer was Sergeant Gennario. (Village Def. Ex. HHH.) Fantry stated, however, that although he often values Gennario's opinion, "in [plaintiff's] case, [Fantry] believe[d] that Gennario's strong military sense of loyalty to one of 'his guys' . . . clouded his judgment" and that Gennario "[did not] seem to want to see what so many others [were] unable to ignore." (Village Def. Ex. HHH.) Fantry further stated that "the problem" with plaintiff was not his knowledge or ability to be "an outstanding Police Officer," but rather, his "outrageous attitude of arrogance [and] disrespect for supervisory authority . . . ." (Village Def. Ex. HHH.)

In addition, Fantry stated that plaintiff "lack[ed] the necessary degree of self-discipline to avoid being the subject of controversy within the Command and with the public as well" and went on to state that although none of the civilian complaints against plaintiff had been substantiated, "the very number of them so early in [plaintiff's] career [gave] rise to concern . . . ." (Village Def. Ex. HHH.) Fantry concluded that although plaintiff had a "strong work ethic" and, with "strong supervision, could possibly be a "terrific asset" for the RVCPD, the question facing McKeon was whether he was willing to "tolerate the disruptive internal problems and civilian complaints that . . . seem[ed] to be inevitable if [the RVCPD] retain[ed] him." (Village Def. Ex. HHH.)

As part of his investigation, Commissioner McKeon contacted the Rockville Centre Deputy Village Clerk, Carol Kramer ("Kramer"), by email dated February 3, 2003, and inquired as to the rules for terminating plaintiff.  (Village 56.1 ¶ 62; Village Def. Ex. YY.)  McKeon also forwarded his email to Ron Wasson ("Wasson"), Rockville Centre's Village Administrator, to apprise Wasson of the investigation he was conducting.  (Village 56.1 ¶ 63; Village Def. Ex. YY.)  Kramer advised McKeon that plaintiff's probationary period was set to expire on September 19, 2003 and that McKeon was free to terminate plaintiff immediately for "not passing probation, no questions asked."  (Village 56.1 ¶ 62; Village Def. Ex. ZZ.)  Kramer further advised McKeon that he could also present plaintiff with the option of resigning voluntarily.  (Village 56.1 ¶ 62; Village Def. Ex. ZZ.)

On February 13, 2003, plaintiff met with Commissioner McKeon and Sergeant Gennario.  (Village 56.1 ¶ 93; Burke 56.1 ¶ 18; McKeon Dep. 27.)  McKeon advised plaintiff that he was in "serious trouble" in the RVCPD.  (McKeon Dep. 29.)  McKeon further advised plaintiff that he had received numerous complaints about him and that "[e]very supervisor had something negative to say" against plaintiff, with the majority recommending that plaintiff be terminated.  (McKeon Dep. 29; Village Def. Ex. III.)  In addition, McKeon suggested that plaintiff may want to avail himself of the opportunity to return to the New York City Police Department while he was still able to.  (McKeon Dep. 29-30; Village Def. Ex. III.)  Plaintiff was not permitted to say anything in his defense either during this meeting or at any point thereafter.  (McKeon Dep. 29-30.)  Nor was plaintiff permitted to respond in any way to the reports about him that were submitted by the various supervisors in the RVCPD.  (McKeon Dep. 125, 128-29.)  Plaintiff did

not complain about discrimination, racial epithets or any other wrongful conduct during this meeting.[8]  (Village 56.1 ¶ 95; Burke 56.1 ¶ 18.)

IV.     The Remainder of Plaintiff's Employment with the RVCPD

On or about February 15, 2003, plaintiff was transferred from Sergeant Burke's supervision to Sergeant Johnson's, where he remained for the rest of his employment with the RVCPD.  (Burke 56.1 ¶ 19.)  Plaintiff has not had any contact with Burke since he was transferred from his supervision.  (Burke 56.1 ¶ 19.)

On April 20, 2003, plaintiff was injured in the line of duty, fracturing his right elbow.  (Village 56.1 ¶ 96; Village Def. Ex. JJJ.)  Plaintiff was unable to work for approximately two months, returning to the RVCPD in June 2003.  (Village 56.1 ¶ 96.)

On July 5, 2003, plaintiff was scheduled to work a "payback" tour but failed to appear.[9]  (Village 56.1 ¶ 97; Burke 56.1 ¶ 20.)  Plaintiff asserted that he never received the email notification sent by Lieutenant Quinn on June 26, 2003, informing him of the payback tour.  (Village 56.1 ¶ 98; Burke 56.1 ¶ 20; Village Def. Ex. LLL, PPP.)  Lieutenant Fantry, however, determined that plaintiff had in fact received Quinn's email by logging into plaintiff's email,

---

[8]  Plaintiff maintains that the reason he did not raise the issue of discrimination during this meeting is because McKeon only wanted to discuss plaintiff's performance.  (Village 56.1 ¶ 95.)  In addition, as noted above, McKeon testified at his deposition that he did not allow plaintiff to speak at all during this meeting.  (McKeon Dep. 29-30.)

[9]  The RVCPD required officers to work "payback" tours after it switched to twelve-hour tours of duty, resulting in officers having to "give back" a certain amount of time to the Village.  Such tours are considered "regularly assigned tours."  (Village 56.1 ¶ 97.)

where he found the email in plaintiff's "previously read mail" folder. (Village 56.1 ¶ 98; Burke 56.1 ¶ 20; Village Def. Ex. NNN.)

On July 10, 2003, plaintiff was scheduled to testify in the Nassau County Court as part of another "payback" tour. (Village Def. Ex. MMM.) Plaintiff was informed of the appearance via an email sent from Lieutenant Marcel on June 27, 2003. (Village Def. Ex. MMM.) Some time prior to his scheduled court appearance, plaintiff contacted the Assistant District Attorney assigned to the case, Glenn Kurtzrock ("Kurtzrock"), and inquired as to whether the court hearing was still going forward on July 10, 2003. (Kurtzrock Dep. 21, annexed as Village Def. Ex. N.) When Kurtzrock informed him that it was, plaintiff inquired as to whether he could testify on a later date, rather than on July 10, 2003, as scheduled, because he had a family vacation planned in Rhode Island. (Kurtzrock Dep. 21; Village Def. Ex. PPP, QQQ.) Plaintiff offered to cancel his vacation if necessary but Kurtrock told him that he had several other witnesses who were going to testify and that he could arrange for plaintiff to give testimony on a later date, since the hearing would last several days. (Kurtrock Dep. 21-22; Village Def. Ex. PPP, QQQ.) Plaintiff did not seek permission from anyone within the RVCPD before contacting Kurtzrock about switching the date of his testimony. (McKeon Dep. 56-57.) Plaintiff ultimately testified on July 14, 2003, at a time for which plaintiff was not scheduled to work and therefore received overtime compensation. (McKeon Dep. 57; Village Def. Ex. RRR, QQQ.)

Commissioner McKeon thereafter requested that three lieutenants, Quinn, Fantry and Marcel, review plaintiff's personnel file and recommend a course of action. (Village 56.1 ¶ 102.) During the time that plaintiff was employed at the RVCPD, he never received any written reprimands or disciplinary warnings that were placed in his personnel file. (McKeon Dep. 81.)

Nor were any formal disciplinary charges ever instituted against plaintiff. (McKeon Dep. 122-23, 125.) In addition, plaintiff's personnel file contained the following positive documentation: (1) an internal memorandum from McKeon, dated July 11, 2003, thanking and commending plaintiff for "completing six months of police service without taking any sick leave," (Pl. Ex. C); (2) a commendation for actions taken with respect to an incident involving an automobile fire, (McKeon Dep. 81-82); (3) an internal memorandum noting that plaintiff "used good judgment" when attempting to detain an individual who appeared to be armed by not "engag[ing] in a firearms incident," but rather, "attempt[ing] to physically subdue the person," (Pl. Ex. F); and, (4) a letter from an individual in the community thanking plaintiff for his actions taken in response to a call for assistance, which described plaintiff as having been "professional, polite and concerned . . . ." (Pl. Ex. E; McKeon Dep. 81-82.)

Plaintiff's personnel file also contained an evaluation completed by Sergeant Gennario, dated January 15, 2003, which awarded plaintiff average to high marks on every aspect of his performance. (Pl. Ex. D.) Gennario's evaluation of plaintiff further stated as follows:

> PO Carmody has continued to improve in his performance in the department. He is an energetic, self starter who has a propensity for police work. He is self confident and displays a great deal of initiative. In the short time he has been with the department he leads the patrol force in arrest. He can handle a [sic] various assignments efficiently and when needed can exert the proper level of authority. He handles all calls enthusiastically. His sick record is perfect and his numbers production is continually amongst the highest in the department. He displays an excellent ability to communicate, especially his writing talents. With greater experience in departmental procedures, PO Carmody's potential in the department could be unlimited.

(Pl. Ex. D.)

After reviewing plaintiff's personnel file, all three lieutenants unanimously recommended that plaintiff be terminated.  (Village Def. Ex. SSS, TTT, UUU.)

V.    Plaintiff's Termination

By email dated July 24, 2003, McKeon again contacted Carol Kramer, as well as the Village Administrator, Ron Wasson, and Martha Krisel, the attorney for the Village of Rockville Centre, to confirm the rules relating to terminating plaintiff.  (Village 56.1 ¶ 103; Village Def. Ex. VVV.)  On August 1, 2003, plaintiff met with McKeon, Sergeant Johnson and Lieutenant Fantry, at which time he was informed by McKeon that he had failed to successfully complete his probationary period and would be terminated in twenty-one days.  (Village 56.1 ¶¶ 104-05; Burke 56.1 ¶ 23; CSC 56.1 ¶ 4; McKeon Dep. 79.)  Plaintiff's employment with the RVCPD was terminated that day, effective August 23, 2003.[10]  (Village 56.1 ¶ 10; Burke 56.1 ¶ 23; CSC 56.1 ¶¶ 5, 20; Village Def. Ex. AA.)  Plaintiff refused to sign the RVCPD memorandum notifying him of his termination.  (Pl. 50(h) Dep. 122; Village Def. Ex. AA.)

Following the August 1, 2003, meeting, plaintiff spoke, via telephone, with Detective Marino and Sergeant James Vafeades, the then Vice President of the PBA, on more than one occasion.[11]  (Village 56.1 ¶¶ 106-07.)  During these conversations, plaintiff discussed the reasons for his termination.  (Village 56.1 ¶¶ 106-07; Village Def. Ex. DDDD, EEEE.)  Plaintiff never

---

[10] Following the August 1, 2003 meeting, Detective Frank Marino ("Marino"), the President of the Police Benevolent Association ("PBA") at the time, asked McKeon to reconsider his decision to terminate plaintiff, both in writing and in person.  (Marino Dep. 58; Pl. Ex. M.)  McKeon declined to do so.  (Marino Dep. 59.)

[11] Unbeknownst to Marino and Vafeades, plaintiff recorded these conversations. (Village 56.1 ¶¶ 106-07; Marino Dep. 94; Village Def. Ex. DDDD, EEEE.)

advised Marino or Vafeades that he was terminated for complaining about discrimination.[12] (Village 56.1 ¶¶ 106-07; Marino Aff., dated Apr. 25, 2008, ¶ 3; Vafeades Aff., dated Apr. 23, 2008, ¶ 3; Village Def. Ex. DDDD, EEEE; Pl. Dep. 206.)

On August 6, 2003, plaintiff and his father, Michael Carmody, Sr., telephoned McKeon.[13] (Village 56.1 ¶ 108.)  During the conversation, both plaintiff and his father informed McKeon that plaintiff would resign from the RVCPD prior to the effective date of his termination. (Village 56.1 ¶ 108; Village Def. Ex. CCCC.)  In addition, both plaintiff and his father requested assurance that there were no criminal charges being asserted against plaintiff and plaintiff inquired as to whether McKeon would provide him with a recommendation.  (Village 56.1 ¶ 109; Village Def. Ex. BBBB.)  McKeon assured plaintiff and his father that if contacted by a future employer, he would indicate that plaintiff had voluntarily resigned.  (Village Def. Ex. CCCC.)

On August 6, 2003, McKeon emailed Ron Wasson to advise him of his telephone conversation with plaintiff and his father.  (Village Def. Ex. WWW.)  McKeon further advised Wasson that he believed plaintiff's letter of resignation would be "forthcoming" and that he indicated to plaintiff that he would accept such a letter, which would be reflected in plaintiff's personnel file.  (Village Def. Ex. WWW.)  By email dated August 8, 2003, McKeon informed

---

[12]  Both Marino and Vafeades testified at their depositions that plaintiff never complained to them about discrimination or race relations within the RVCPD at any point either during his employment or after his termination.  (Marino Dep. 89-93; Vafeades Dep. 8.)  Nor did plaintiff ever complain to Marino or Vafeades about the use of racial epithets or derogatory language being used by members of the RVCPD to describe African-Americans.  (Marino Dep. 93; Vafeades Dep. 8-9.)  Marino further testified that plaintiff never complained to him that he was being discriminated against by members of the RVCPD for standing up for the rights of African-Americans.  (Marino Dep. 93.)

[13]  Unbeknownst to McKeon, plaintiff recorded this telephone conversation.  (Village 56.1 ¶ 109.)

Carol Kramer of the same and noted that plaintiff was submitting his voluntary resignation in order to gain a "better chance" at being reinstated to the civil service list or the NYPD.  (Village Def. Ex. XXX.)

By letter dated August 11, 2003, plaintiff resigned from the RVCPD, effective that same date.  (Village 56.1 ¶ 110; Village Def. Ex. ZZZ.)  In his letter, plaintiff stated that his resignation from the RVCPD was based on his preference to "work[] for a department that [could] afford [him] a better opportunity for advancement."  (Village Def. Ex. ZZZ.)


VI.     The CSC's Denial of Plaintiff's Reinstatement Request

On or about August 6, 2003, the CSC received a Report of Personnel Action and Probationary Report ("Personnel Report") from the Village, dated August 5, 2003, which advised that plaintiff was being discharged due to his unsatisfactory conduct, capacity and fitness during his probationary period.  (CSC 56.1 ¶ 19; Williams Dep. 15, 17.)  Thereafter, the CSC received a second Personnel Report, dated August 13, 2003, which changed plaintiff's termination to a resignation, effective August 11, 2003.  (CSC 56.1 ¶ 21; Williams Dep. 16-17.)

On August 11, 2003, plaintiff wrote to the then Executive Director of the CSC, Thomas Williams ("Williams"), and requested reinstatement to Civil Service eligible list No. 4200.  (CSC 56.1 ¶ 22; Pl. Ex. I.)  In his letter, plaintiff informed Williams that he resigned from the RVCPD "because [he] would prefer working for a department that can afford a better opportunity for advancement."  (CSC 56.1 ¶ 23; Pl. Ex. I.)

By letter dated August 18, 2003, McKeon advised Williams of plaintiff's resignation from the RVCPD.  (Village 56.1 ¶ 111; Burke 56.1 ¶ 24; CSC ¶ 56.1 24; Village Def. Ex.

AAAA.)  In his letter, McKeon stated that plaintiff was "zealous and motivated" during his employment with the RVCPD.  (Village Def. Ex. AAAA.)  McKeon also requested that plaintiff be restored to the civil service list.  (Village 56.1 ¶ 111; Burke 56.1 ¶ 24; CSC 56.1 ¶ 24; Village Def. Ex. AAAA.)

On August 26, 2003, the Commissioners met and reviewed plaintiff's request for reinstatement.  (CSC 56.1 ¶ 25.)  After consideration, the Commissioners adopted a resolution denying plaintiff's request to be reinstated to Police Officer Civil Service List No. 4200.  (CSC 56.1 ¶ 26; Burke 56.1 ¶ 24; Pl. Ex. I.)  Williams informed plaintiff of the CSC's decision in writing on or about September 3, 2003.  (CSC 56.1 ¶ 27.)

By letter to Williams dated September 10, 2003, plaintiff inquired as to the reason for the CSC's decision not to reinstate plaintiff to the civil service list.  (CSC 56.1 ¶ 28; Pl. Ex. I.)  Williams replied to plaintiff in writing on September 22, 2003, advising him that the Commissioners had reviewed his situation and "determined that reinstatement was not appropriate."  (CSC 56.1 ¶ 29; Pl. Ex. I.)  Williams further advised plaintiff that reinstatement of a candidate to a competitive title list is within the sole discretion of the Commissioners.  (CSC 56.1 ¶ 29; Williams Dep. 30-31, 42-43; Pl. Ex. I.)  By the same letter, Williams also requested, "[a]s an aside," that plaintiff explain why he was initially terminated by the RVCPD for "unsatisfactory probation."  (CSC 56.1 ¶ 30; Pl. Ex. I.)

By letter dated September 30, 2003, plaintiff responded to Williams' inquiry, stating that the RVCPD had not advised him of the reason for his initial termination and that he was "the victim of a gross injustice that was directed to destroy [his] career as a professional police officer."  (CSC 56.1 ¶ 31; Pl. Ex. I.)  Plaintiff further advised Williams of his willingness to meet

with the CSC to discuss the matter further.  (CSC 56.1 ¶ 32; Pl. Ex. I.)  Nowhere in his letter did plaintiff state that he was terminated in retaliation for his objections to perceived discrimination on the part of the RVCPD.[14]  (Williams Dep. 49-50.)

On October 17, 2003, plaintiff again wrote to Williams, requesting a meeting with him and the Commissioners regarding the RVCPD's termination of his employment due to his unsatisfactory probationary period.  (CSC 56.1 ¶ 33.)  Plaintiff did not state anywhere in his letter that his termination was the result of retaliation or discrimination.  (Williams Dep. 49-50.)

Williams was terminated as Executive Director of the CSC in November 2003 and, in December 2003, Karl Kampe ("Kampe") was appointed as his replacement.  (CSC 56.1 ¶¶ 34-35.)  Shortly after being appointed to the position of Executive Director, Kampe responded to a letter that plaintiff sent to County Executive Thomas Suozzi, dated December 11, 2003, complaining that his letters to the CSC requesting reinstatement to the civil service list had gone unanswered since September 30, 2003.  (CSC 56.1 ¶ 37; Pl. Ex. B.)  By letter dated December 18, 2003, Kampe informed plaintiff that Williams was no longer the Executive Director of the CSC and that he would submit plaintiff's appeal to the Commissioners.  (CSC 56.1 ¶ 38.)  Kampe requested that plaintiff send him, in a timely fashion, all information that he deemed relevant as to why the CSC should reinstate plaintiff to the civil service list.  (CSC 56.1 ¶ 38.)  Kampe thereafter sent plaintiff a follow-up letter, dated December 26, 2003, informing plaintiff

_____

[14]  At his deposition, Williams testified that had plaintiff advised him of any alleged discrimination or retaliation, such information would have been provided to the Commissioners in connection with his request for reinstatement to the civil service list.  (Williams Dep. 64-65.)  By affidavit dated October 3, 2008, David Gugerty, one of the Commissioners of the CSC at the time plaintiff requested reinstatement to the civil service list, stated that he was unaware of any allegations of discriminatory conduct or retaliation at the time the Commissioners considered plaintiff's request.  (Gugerty Aff. ¶¶ 3-4.)

that he had not yet received a response to his December 18, 2003 correspondence.  (CSC 56.1 ¶ 39.)

On January 6, 2004, plaintiff's attorney, Frederick Brewington ("Brewington"), wrote to Kampe, apologizing for plaintiff's delay in responding to Kampe's December 18, 2003 correspondence and requesting that plaintiff's appeal be submitted.  (CSC 56.1 ¶ 40.)  By letter dated January 29, 2004, Kampe again advised plaintiff, via correspondence addressed to Brewington, that plaintiff should promptly file his appeal.  (CSC 56.1 ¶ 41.)  Kampe further advised Brewington that due to the fact that so much time had elapsed, the consideration of any appeal would be at the discretion of the Commissioners.  (CSC 56.1 ¶ 42.)

On March 18, 2004, Police Officer Civil Service List No. 4200 expired.  (CSC 56.1 ¶ 43; CSC Ex. U.)  By letter dated February 2, 2005, more than one year after Kampe's letter advising that plaintiff should promptly file his appeal, Brewington contacted Kampe and enclosed the requested documentation for the CSC's consideration.  (CSC 56.1 ¶ 44; CSC Ex. U.)

Plaintiff never advised the CSC of any alleged discrimination or racial slurs occurring within the RVCPD during the course of his employment there.  (CSC 56.1 ¶ 45.)  Nor did plaintiff make any such allegations in his correspondence with the CSC after his termination.  (CSC 56.1 ¶ 46.)


VII.    Plaintiff's Allegations of Discriminatory Conduct and Retaliation Within the RVCPD

Plaintiff alleges that certain officers and supervisors within the RVCPD - specifically, Sergeants Johnson, Burke and Calder and Lieutenant Fantry - referred to certain lower-income housing areas in the Village - known as the "west end" - as the "projects" or the "zoo" and that

they used various racial slurs to describe the residents of those areas, such as "animals," "niggers," "monkeys," and "savages." (Pl. 50(h) Dep. 36-39; Pl. Dep. 63-68.) Plaintiff did not complain to any supervisors about these comments when he first heard them but alleges that he discussed them with Officer Giovanello.[15] (Pl. 50(h) Dep. 46-47.)

Plaintiff also alleges that these racially derogatory comments were often made in front of an African-American dispatcher employed by the RVCPD, Courtney Holsey ("Holsey"). (Pl. Dep. 8-16.) After one such incident, in October 2002, plaintiff approached Sergeant Johnson and advised him that such comments were inappropriate, particularly when made in Holsey's presence. (Pl. Dep. 17-19; Pl. Dep. II 33-40.) Sergeant Johnson thanked plaintiff for bringing the issue to his attention.[16] (Pl. Dep. 19.) However, according to plaintiff, the officers within the RVCPD - and specifically, Lieutenants Fantry and Marcel, Sergeants Burke and Johnson and Commissioner McKeon - continued to use racial slurs in front of Holsey throughout 2002 and into the summer of 2003. (Pl. Dep. 26-27; 90-107, 111-18, 127-29, 142-49.) In December 2002, plaintiff again complained about the use of racially charged language within the RVCPD, this time to both Sergeants Johnson and Gennario.[17] (Pl. Dep. II 48-51.) Plaintiff did not file any written complaints. (Pl. Dep. 29-30; 121-23.)

---

[15] Giovanello refuted this at his deposition, testifying that he never had any such discussions with plaintiff. (Giovanello Dep. 51.) Nor did Giovanello ever hear any "racially charged language" used by officers within the RVCPD, including Sergeant Burke, during the time that plaintiff was employed by the RVCPD. (Giovanello Dep. 52, 110-11.)

[16] Johnson disputes that any such conversation between he and plaintiff ever took place. (Johnson Aff. ¶ 3.) Nor did Holsey ever complain to Johnson about the use of racial slurs in her presence. (Johnson Aff. ¶ 4.)

[17] Sergeants Johnson and Gennario both dispute that plaintiff ever complained to them about the use of discriminatory language within the RVCPD. (Johnson Aff. ¶ 4; Gennario Aff. ¶ 5.)

Plaintiff alleges that from July or August of 2002 to January 2003, he was advised several times by his supervisor, Sergeant Gennario, that Sergeant Burke was "badmouthing" him at supervisor meetings, referring to plaintiff as "disrespectful." (Pl. 50(h) Dep. 44-45; Pl. Dep. II 44-45.) During the same time, plaintiff heard similar statements from Sergeants Marino and Vafeades and was informed by Officer James Lauth that Burke "ha[d] a hard on for [plaintiff] and [was] gunning for [him]."[18] (Pl. 50(h) Dep. 45, 52, 56.)

On January 22, 2003, plaintiff arrived for work at the RVCPD and, while changing in the locker room, overheard a conversation between Sergeants Burke and Johnson wherein Burke stated that he was placing plaintiff on a different "post" that night so that he could "keep a[n] . . . eye on him." (Pl. 50(h) Dep. 59-60.) Plaintiff alleges that he heard Johnson reply that plaintiff was the "only one that like[d] working [the post] with the . . . niggers." (Pl. 50(h) Dep. 61.) Plaintiff further alleges that he heard Burke state that he did not need plaintiff "entertaining" the residents of the west end. (Pl. 50(h) Dep. 61-62.) Burke further stated that plaintiff needed to learn that he was "the new guy" and that Burke was "the boss." (Pl. 50(h) Dep. 63.) Plaintiff alleges that he complained about what he overheard to Sergeants Johnson and Vafeades, and

---

[18] Officer Giovanello testified at his deposition that prior to the time that Burke supervised plaintiff, he "got the feeling that [the two] didn't like each other," and, more specifically, that plaintiff did not like Burke. (Giovanello Dep. 21-22.) Specifically, Giovanello testified that plaintiff's comments were "disrespectful towards Sergeant Burke" in that plaintiff "didn't think [Burke] was capable of being a cop or a supervisor." (Giovanello Dep. 116.)

specifically, about Burke's use of racially derogatory language.[19]  (Pl. 50(h) Dep. 63-64; Pl. Dep. 200-02.)

Following roll call that same night, as plaintiff was getting in his patrol car outside of headquarters, Burke approached him, asking "who . . . do you think you are."  (Pl. 50(h) Dep. 74-75.)  According to plaintiff, Burke went on to state "if you don't like what I say about you, that's too . . . bad.  If you don't like the way I talk about people in the community, that's too . . . bad.  It's obvious you haven't figured out how we do things around here."  (Pl. 50(h) Dep. 75.) Burke allegedly concluded the conversation, stating "the day I can . . . get you, I'm going to get you."  (Pl. 50(h) Dep. 76.)

Plaintiff alleges that Burke continued to harass him throughout the time that he was plaintiff's supervisor.  (Pl. 50(h) Dep. 76-99.)  In February or March of 2003, plaintiff was on patrol and assigned to a special attention post when a burglary call in the area to which plaintiff was assigned came over the police radio.  (Pl. 50(h) Dep. 95-96.)  Plaintiff asked to assist in the burglary but Burke instructed him to remain where he was.  (Pl. 50(h) Dep. 96-97.)  Plaintiff thereafter complained to Detective Marino, the PBA President, about Burke's behavior and requested a squad change.[20]  (Pl. 50(h) Dep. 99-100.)  Plaintiff's request was denied.  (Pl. 50(h)

---

[19]  Johnson disputed this at his deposition and in his affidavit submitted in support of the Village Defendants motion, stating that plaintiff never "complain[ed] to [him], verbally or in writing, about the use of racial slurs by members of the R[V]CPD . . . ."  (Johnson Dep. 78; Johnson Aff. ¶ 4.)  Nor did Johnson ever hear any racial slurs used by any officers within the RVCPD, including Burke.  (Johnson Dep. 31, 77.)  Vafeades also denies receiving any such complaint.  (Vafeades Dep. 8-9; Vafeades Aff. ¶ 2.)

[20]  Plaintiff alleges that he also complained to Marino about the use of racial slurs within the RVCPD at the same time.  (Pl. Dep. 192-97.)  Marino denies that plaintiff made any such complaint.  (Marino Dep. 89-93; Marino Aff. ¶ 2.)

Dep. 100-02.) Giovanello subsequently agreed to change shifts with plaintiff and plaintiff was no longer under Burke's supervision. (Pl. 50(h) Dep. 107.) Plaintiff did not file any written complaints concerning Burke's alleged harassment. (Pl. Dep. II 210-11.)


VIII.   Plaintiff's Administrative Filings and the Within Action

On October 24, 2003, plaintiff filed a Notice of Claim with the Nassau County Attorney, the Clerk of the Village of Rockville Centre, the RVCPD and the CSC, claiming that he was wrongfully discharged from the RVCPD in retaliation for his opposition to discriminatory practices. (CSC Ex. BB.) Plaintiff further claimed that his wrongful discharge violated his constitutional rights and constituted a breach of contract. (CSC Ex. BB.)

On February 24, 2004, plaintiff filed a Charge of Discrimination with the New York State Division of Human Rights ("NYSDHR"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"), and which plaintiff amended on March 4, 2004. (Village 56.1 ¶ 112; Burke 56.1 ¶ 25; Village Def. Ex. A ¶ 8.) In his amended NYSDHR charge, plaintiff alleged that Burke "disliked" him because he wanted to "change the language used toward and the way members of the [RVCPD] considered, spoke about and interacted with African-Americans in the office and in the communities." (Village 56.1 ¶ 113; Village Def. Ex. B.) Plaintiff further amended his charge to allege that he had "specifically objected to the use of racial slurs about African-Americans that were made in the work place in front [of] one of the women civilian workers, Courtney Holsey, who is African-American." (Village Def. Ex. B ¶ 8.)

Plaintiff also alleged that Holsey "acknowledge[d] that she had heard the comments on more than one occasion and that she found them offensive."[21]  (Village Def. Ex. B ¶ 8.)

Neither the NYSDHR or the EEOC rendered a decision on the merits of plaintiff's claims.  (Burke 56.1 ¶ 25.)  Rather, plaintiff requested that his claims be dismissed for administrative convenience so that he could pursue his remedies in federal court.  (Burke 56.1 ¶ 25.)  Plaintiff received a right to sue letter on or about January 25, 2005 and commenced the within action on October 20, 2005.  (Burke 56.1 ¶ 26.)

<u>DISCUSSION</u>

I.  <u>Legal Standard</u>

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The burden is on the moving party to establish the lack of any factual issues.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The very language of this standard reveals that an otherwise

---

[21]  Courtney Holsey disputed these allegations during her deposition, testifying that during the time that plaintiff was employed by the RVCPD, she never heard any of her supervisors, including Burke, make derogatory comments about African-Americans.  (Holsey Dep. 29, 43, 54, annexed as Village Def. Ex. J.)  Nor did Holsey ever feel that she was being discriminated against or make any complaints to her union, her supervisors or plaintiff that she was being subjected to discrimination.  (Holsey Dep. 34.)  Holsey further testified that she never advised plaintiff that she had heard racist or discriminatory remarks being made within the RVCPD, which she found offensive.  (Holsey Dep. 34-35.)  In addition, Holsey submitted an affidavit to the NYSDHR in response to plaintiff's amended charge, stating that during the time that plaintiff was employed by the RVCPD, she "did not hear any racial slurs uttered by members of the R[V]CPD."  (Holsey Aff., dated May 6, 2004, ¶ 2, annexed as Village Def. Ex. C.)  "Nor did [she] complain to [her] supervisor or ask [plaintiff] to complain on [her] behalf."  (Holsey Aff. ¶ 2.)

properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  Rather, the requirement is that there be no "genuine issue of material fact."  Id. at 248.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).  When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts."  Id. at 586.  Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial."  Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, the district court "must also be 'mindful of the underlying standards and burdens of proof' . . . because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  SEC v. Meltzer, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988)) (internal citations omitted).  "Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim."  Meltzer, 440 F. Supp. 2d at 187.

Motions for summary judgment in employment discrimination actions should be evaluated with special care.  See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citations omitted).  Since "direct evidence of an employer's discriminatory intent will rarely be

found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Id. (quoting Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)). Even in the discrimination context, however, a plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." Schwapp, 118 F.3d at 110 (citing Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).

II.     The McDonnell Douglas Burden-Shifting Framework

Plaintiff alleges discrimination and retaliation pursuant to Title VII, 42 U.S.C. §§ 1981 and 1983, and New York State Human Rights Law § 296 ("Section 296"), all of which are analyzed pursuant to the three-step burden-shifting framework first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).[22] See Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (applying McDonnell Douglas burden-shifting framework to Title VII discrimination claim and noting that the same standard applies to claims brought pursuant to Section 296 of the New York Human Rights Law); Sumner v. United States Postal Serv., 899 F.2d 203, 208 (2d Cir. 1990) ("The order and allocation of burdens of proof in retaliation cases follow that of general disparate treatment analysis as set forth in McDonnell Douglas . . . ."); Davis v. Oyster Bay-East, No. 03-CV-1327, 2006 WL 657038, at *8, n.12 (E.D.N.Y. Mar. 9,

_____

[22] Although plaintiff's Complaint refers to both discrimination and retaliation, the evidence submitted establishes that the discriminatory conduct plaintiff alleges to have taken place did not begin until after plaintiff allegedly began opposing the use of racially derogatory language within the RVCPD. Accordingly, the crux of plaintiff's employment discrimination claims - whether alleged under Title VII, Sections 1981 and 1983, or the New York Human Rights Law - is for unlawful retaliation.

2006), aff'd, 220 Fed. Appx. 59 (2d Cir. 2007) (stating that "discrimination claims under Title VII, 42 U.S.C. §§ 1981 and 1983, and NYHRL § 296 are analyzed together, as the same analytic framework applies to each").

The first step of the burden-shifting analysis requires plaintiff to demonstrate a prima facie case of discrimination or retaliation.  See Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) (citing McDonnell Douglas, 411 U.S. at 802-04); Satterfield v. UPS, No. 00 Civ. 7190, 2003 U.S. Dist. LEXIS 17229, at *27 (S.D.N.Y. Sept. 29, 2003) ("The first step [of the burden-shifting process] requires proof of a prima facie case.").  Once plaintiff satisfies this initial burden, "the employer is required to offer a legitimate, non-discriminatory business rationale for its conduct."  Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (citing McDonnell Douglas, 411 U.S. at 802).  The burden then shifts back to the plaintiff "to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"  Back v. Hastings on Hudson U.F.S.D, 365 F.3d 107, 123 (2d Cir. 2004) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).


III.    Title VII

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII also prohibits employers from retaliating against employees for opposing

discriminatory employment practices.  See 42 U.S.C. § 2000e-3(a).  "Title VII . . . is violated

when a retaliatory motive plays a part in adverse employment actions toward an employee,

whether or not it was the sole cause" or "when an employer is motivated by retaliatory animus,

even if valid objective reasons for the discharge exist."  Cosgrove v. Sears, Roebuck & Co., 9

F.3d 1033, 1039 (2d Cir. 1993) (citing cases).

Plaintiff alleges that the Village Defendants discriminated and retaliated against him,

ultimately terminating his employment, based on his "stated opposition to racially discriminatory

statements and actions," in violation of Title VII.  (Compl. ¶ 59.)  To establish a prima facie case

of retaliation under Title VII, plaintiff must demonstrate that (1) he engaged in a statutorily

protected activity; (2) his employer was aware of this activity; (3) he suffered an adverse

employment action; and (4) there is a "causal connection" between the protected activity and the

adverse employment action.  Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199,

205 (2d Cir. 1996) (citing Cifra v. General Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)).  The

Village Defendants seek summary judgment on the grounds that plaintiff cannot establish a

prima facie case of retaliation, in that he did not engage in statutorily protected activity and that,

even if plaintiff did engage in such activity, there is no causal connection between that activity

and his termination.

After considering all of the evidence submitted in support of and in opposition to the

Village Defendants' motion for summary judgment, I find that a genuine issue of material fact

exits with respect to whether plaintiff can demonstrate a prima facie case of retaliation.  Plaintiff

alleges that he complained to several supervisors - namely, Sergeants Johnson and Gennario - on

more than one occasion concerning the use of racially derogatory language within the RVCPD,

and more specifically, in front of an African-American co-worker, Courtney Holsey.  In support

of this claim, plaintiff has offered substantial deposition testimony detailing the specifics of these

complaints, including where, when and to whom they were made, as well as the substance of

those conversations.  Conversely, the Village Defendants have offered the affidavits and

deposition testimony of numerous officers who worked with plaintiff, all of whom deny that

plaintiff ever made any such complaints and assert that they never heard such language used by

members of the RVCPD.  "Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Reeves

v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000) (citing Anderson, 477 U.S. at 255); see

also Riscili v. Gibson Guitar Corp., 605 F. Supp. 2d 558, 568-69 (S.D.N.Y. 2009) (denying

summary judgment on plaintiff's retaliation claim where witnesses provided contradictory

testimony).  In addition, where, as here, a question of fact exists with respect to whether plaintiff

engaged in protected activity, summary judgment should be denied.  See, e.g., Braunstein v.

Barber, No. 06 Civ. 5978, 2009 U.S. Dist. LEXIS 32536, at *30-31 (Mar. 27, 2009)

(recommending denial of summary judgment where "a question of fact exist[ed] regarding

whether plaintiff engaged in protected activity"); Krikelis v. Vassar Coll., 581 F. Supp. 2d 476,

490 (S.D.N.Y. 2008) (denying summary judgment where plaintiff "raised a triable issue of fact

with respect to engaging in a protected activity"); Bandhan v. Laboratory Corp., 234 F. Supp. 2d

313, 320 n.10 (S.D.N.Y. 2002) (stating that a question of fact existed as to whether plaintiff

engaged in protected activity).

Defendants also seek summary judgment with respect to plaintiff's Title VII claim against individual defendant McKeon.[23] It is well-settled in the Second Circuit that "individuals are not subject to liability under Title VII." Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (citations omitted). However, this restriction has only been clearly applied where individual defendants are sued in their individual capacity. See Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003) (affirming dismissal of Title VII claim against individual defendant in his "personal capacity" because "under Title VII individual supervisors are not subject to liability").

Whether individuals may be liable under Title VII in their official capacity remains an open question in this circuit. See Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1241 n.2 (2d Cir. 1995) (declining to address "the issue of whether . . . an individual [supervisor] may be made a party defendant solely in the person's corporate capacity as an agent of the employer"). Earlier district court cases to address the issue have held that "an individual supervisory employee may be named in her official capacity [under Title VII] as an agent of an 'employer,' if [he] 'participated in the decision making process that forms the basis of the discrimination.'" Jones v. Inter-County Imaging Ctrs., 889 F. Supp. 741, 745 (S.D.N.Y. 1995) (quoting Bostick v. Rappleyea, 629 F. Supp. 1328, 1334 (N.D.N.Y. 1985), aff'd sub nom., Bostick v. Cochrane, 907 F.2d 144 (2d Cir. 1990)). However, more recent decisions have rejected Title VII official capacity claims. See, e.g., Milano v. Barnhart, No. 05 Civ. 6527, 2007 U.S. Dist. LEXIS 51011,

_____

[23] It should be noted that plaintiff's Complaint does not appear to name McKeon with respect to his Title VII claim. However, in his opposition to the Village Defendants' motion, plaintiff asserts that McKeon may be liable under Title VII. Although it is unclear whether a Title VII claim has actually been asserted here against McKeon, the Court will nonetheless address it.

at *8-9 (S.D.N.Y. July 11, 2007) (stating that "the majority of courts in this circuit have held that the reasoning of Tomka [v. Seiler, 66 F.3d 1295 (2d Cir. 1995)], would bar any Title VII suit . . . against an individual supervisor, regardless of the capacity in which the individual was acting") (collecting cases) (emphasis in original); Garcia v. New York State, No. 05 Civ. 5138, 2005 U.S. Dist. LEXIS 22991, at *6 (S.D.N.Y. Oct. 5, 2005) ("Courts within [the Second Circuit] have also generally found that individuals may not be sued in their official capacities under Title VII."); Figueroa v. City of New York, 198 F. Supp. 2d 555, 558 n.1 (2002) ("[W]hile the Second Circuit has not yet decided the issue, many courts have held that supervisors may not be sued in their official capacity [under Title VII].").

Based on the foregoing, I recommend that the Village Defendants be granted summary judgment with respect to any Title VII claim that may be asserted against Commissioner McKeon, in both his official and individual capacities.  However, I recommend that summary judgment be denied with respect to plaintiff's Title VII claim against the Village and the RVCPD.

IV.     New York State Human Rights Law

Section 296 of the New York State Human Rights Law prohibits discrimination in employment on the basis of "age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status . . . ."  N.Y. Exec. Law § 296(1)(a).  With respect to retaliation, Section 296 provides that it is unlawful for any employer to "discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article . . . ."  Id. § 296(1)(e).  Analysis of a

retaliation claim under Section 296 is the same as that under Title VII.  See McMenemy v. City of Rochester, 241 F.3d 279, 283 n.1 (2d Cir. 2001); Davis, 2006 WL 657038, at *8, n.12.

Unlike Title VII, however, Section 296 provides for individual liability.  Under Section 296(1), a supervisor may be held liable as an "employer" if he or she has "the authority to 'hire and fire' employees."  Gentile v. Town of Huntington, 288 F. Supp. 2d 316, 321 (E.D.N.Y. 2003) (quoting Tomka, 66 F.3d at 1317)); see also Feingold, 366 F.3d at 157-58 ("A supervisor is an 'employer' for purposes of establishing liability under the NYHRL . . . .").  In addition, both supervisors and co-workers may be held individually liable under an aiding and abetting theory where he or she "actually participates in the conduct giving rise to a discrimination claim."  Humphrey v. County of Nassau, No. 06-CV-3682, 2009 U.S. Dist. LEXIS 27105, at *72-73 (Mar. 30, 2009) (citing cases); see also Feingold, 366 F.3d at 157-58; N.Y. Exec. Law § 296(6).

A.     The Village Defendants and Sergeant Burke

As with plaintiff's Title VII claim, there is a question of fact as to whether plaintiff complained about the use of racial slurs within the RVCPD, which plaintiff alleges prompted the Village Defendants and Burke to retaliate against him.  Accordingly, summary judgment is inappropriate with respect to this claim.

Moreover, although both Commissioner McKeon and Sergeant Burke may be held personally liable under the New York Human Rights Law, a question of fact exists with respect to whether they actually participated in the discriminatory conduct plaintiff alleges to have suffered.  As Commissioner of the RVCPD, McKeon undoubtedly had the authority to hire and fire plaintiff.  Plaintiff alleges that Commissioner McKeon was aware of the discrimination he

was being subjected to, yet did nothing to rectify it, instead terminating plaintiff.  McKeon, however, testified at his deposition that he was unaware of any racial slurs being used within the RVCPD and that plaintiff never brought such information to his attention.  It is undisputed that plaintiff met with McKeon on only two occasions - in February 2003 and in August 2003 - and that plaintiff never apprised McKeon of the conduct taking place within the RVCPD.  However, plaintiff asserts that, at his request, Sergeant Gennario informed McKeon of the plaintiff's allegations, which plaintiff believed was the reason for the February 2003 meeting.  Plaintiff further asserts that he attempted to raise the issue with McKeon in the February meeting but was precluded from doing so.  McKeon testified at his deposition that he did not permit plaintiff to speak at that meeting.

With respect to Sergeant Burke, plaintiff testified to multiple, specific occasions on which he heard Burke using racial slurs and, in particular, in the presence of an African-American co-worker.  Plaintiff further testified to several conversations between he and Burke in which Burke acknowledged his use of racial slurs and advised plaintiff that there was nothing plaintiff could do about it.  In addition, plaintiff testified to specific instances in which he alleges to have been harassed by Sergeant Burke, providing specific details of the conversations.  Burke has denied all of plaintiff's allegations.

Based on the foregoing, there exists a genuine issue of material fact with respect to whether McKeon and Burke personally participated in the discriminatory conduct plaintiff alleges to have suffered.  Accordingly, I recommend that the Village Defendants' (including McKeon) and Burke's motions for summary judgment with respect to plaintiff's New York Human Rights Law claim be denied.

B.    The CSC

With respect to the CSC, although there is a question of fact regarding plaintiff's alleged participation in a protected activity, this claim fails as a matter of law because plaintiff has offered absolutely no evidence from which the Court may conclude that the CSC was aware of plaintiff's complaints.  None of the letters that plaintiff sent to the CSC raised the issue of discrimination and/or retaliation.  (Pl. Ex. I.)  In fact, when plaintiff first wrote to the CSC requesting reinstatement to the civil service list, he stated that he resigned from the RVCPD "because [he] would prefer working for a department that [could] afford a better opportunity for advancement."  (Pl. Ex. I.)  Moreover, when Williams, the Executive Director of the CSC at the time, inquired as to why plaintiff was originally terminated from the RVCPD, yet then permitted to resign, plaintiff responded that "[t]hese are very important questions I would like to know myself."  (Pl. Ex. I.)  All that plaintiff offered as an explanation in response to Williams' question was that he felt he was "the victim of a gross injustice that was directed to destroy [his] career as a professional police officer."  (Pl. Ex. I.)  This statement was not enough to put the CSC on notice that plaintiff had been terminated for opposing discrimination.

In addition, Williams testified at his deposition that plaintiff never advised him that he was retaliated against for opposing discriminatory conduct, and that had plaintiff done so, such information would have been provided to the Commissioners in connection with his request for reinstatement to the civil service list.  (Williams Dep. 64-65.)  David Gugerty, one of the Commissioners of the CSC, similarly stated that he was unaware of any allegations of discriminatory conduct or retaliation at the time the Commissioners considered plaintiff's request.  (Gugerty Aff. ¶¶ 3-4.)  Plaintiff has not disputed or refuted this testimony in any way.

Plaintiff asserts that the CSC was aware of his having engaged in protected activity after it received his NYSDHR charges alleging discrimination and retaliation in February and March 2005. However, the CSC received these charges more than one year after they denied plaintiff reinstatement to the civil service list, which is the only arguable adverse action that the CSC took against plaintiff. In addition, the CSC did not have any contact with plaintiff after January 2004, when Executive Director Kampe advised plaintiff to promptly file his appeal of the August 26, 2003 decision denying him reinstatement. (Kampe Aff., May 27, 2008, Ex. R.) Plaintiff never filed his appeal and the next time the CSC heard from him was when his attorney forwarded copies of plaintiff's NYSDHR charges in February 2005 - more than one year later. (Kampe Aff., Ex. S.) No further decisions were ever rendered with respect to plaintiff's request for reinstatement because the civil service list expired in March 2004, making plaintiff's request moot.

Based on the foregoing, there is no genuine issue of fact that the CSC was unaware of plaintiff's alleged participation in a protected activity. As a result, plaintiff cannot establish a prima facie case of retaliation under the New York Human Rights Law. Accordingly, I recommend that the CSC's motion for summary judgment be granted as to plaintiff's New York Human Rights Law claim.

V.    The 42 U.S.C. §§ 1981 and 1983 Official Capacity Claims Against McKeon and Burke

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 n.55 (1978). To succeed on a claim against a municipal officer in their official

capacity, the plaintiff "must still show that a [municipal] custom, policy or practice was the moving force behind the alleged constitutional violations." Escobar v. City of New York, No. 1:05-cv-3030, 2007 U.S. Dist. LEXIS 45952, at *9 (E.D.N.Y. June 24, 2007) (citing Barry v. New York City Police Dep't, No. 01-cv-10627, 2004 WL 758299, at *9 (S.D.N.Y. Apr. 7, 2004)). As such, "[a] suit for damages against a municipal officer *in their official capacity* is the equivalent of a damage suit against the municipality itself." Escobar, 2007 U.S. Dist. LEXIS 45952, at *9-10 (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)) (emphasis in original); see also Orange v. County of Suffolk, 830 F. Supp. 701, 706 (E.D.N.Y. 1993) ("A suit against a municipal officer in his official capacity is functionally equivalent to a suit against the entity of which the officer is an agent."). "Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as 'redundant and an inefficient use of judicial resources.'" Dejean v. County of Nassau, No. CV-06-6317, 2008 U.S. Dist. LEXIS 4291, at *14 (E.D.N.Y. Jan 8. 2008) (quoting Escobar, 2007 U.S. Dist. LEXIS 45952, at *10) (citing cases).

Based on the foregoing, to the extent the individual defendants, McKeon and Burke, are being sued in their official capacities, any claims against them are "merely duplicative of the action against the [Village]." Escobar, 2007 U.S. Dist. LEXIS 45952, at *10 (citing cases). Accordingly, the plaintiff's claims against the individual defendants in their official capacities, pursuant to 42 U.S.C. §§ 1981 and 1983 should be dismissed. See Dejean, 2008 U.S. Dist. LEXIS 4291, at *14 (dismissing claims against individual defendants in their official capacities

as "duplicative and redundant" of the claim against the County); Escobar, 2007 U.S. Dist.

LEXIS 45952, at *11 (same); Orange, 830 F. Supp. at 707 (same).

VI.     The Sections 1981 and 1983 Discrimination and Monell Claims

As stated supra, Section 1981 and Section 1983 discrimination and retaliation claims are

analyzed the same as Title VII claims.  See Davis, 2006 WL 657038, at *8, n.12.  However,

plaintiff must also demonstrate that the discrimination was intentional.  See Patterson, 375 F.3d

at 226.  Unlike Title VII, individuals may be held liable under Sections 1981 and 1983  "for

certain types of discriminatory acts."  Id.

In addition, where the defendant alleged to have discriminated or retaliated against an

employee under Sections 1981 or 1983 is a municipality, a plaintiff must also demonstrate that

the claimed violation of his or her constitutional rights occurred as a result of a municipal policy

or custom.  See John v. New York City Dept. of Educ., No. 04 Civ. 5861, 2006 WL 2482622, at

*6 (S.D.N.Y. Aug. 29, 2006) (citation omitted).  This is the same standard for prevailing on a

claim of municipal liability under Section 1983, also known as a Monell claim.  See Monell, 436

U.S. at 691 ("[T]he language of § 1983 . . . compels the conclusion that Congress did not intend

municipalities to be held liable unless action pursuant to official municipal policy of some nature

caused a constitutional tort.").  Respondeat superior may not serve as the basis for imposing

municipal liability, see Board of the County Comm'rs v. Brown, 520 U.S. 397, 403 (1997) ("We

have consistently refused to hold municipalities liable under a theory of respondeat superior.");

Allen v. City of Yonkers, 803 F. Supp. 679, 683 (S.D.N.Y. 1992) ("Respondeat superior does

not apply to the liability of municipal entities . . . ."), and the plaintiff bears the burden of

establishing municipal liability.  See Rubio v. County of Suffolk, No. 01-CV-1806, 2007 U.S. Dist. LEXIS 75344, at *6-7 (E.D.N.Y. Oct. 9, 2007) (citing Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)).

In seeking to hold a municipality liable under § 1983, a plaintiff is not required to demonstrate that the municipality had "an explicitly stated rule or regulation." Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) (citing Villante v. Dep't of Corr., 786 F.2d 516, 519 (2d Cir. 1986)).  Rather, "a municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (citing Turpin v. Mailet, 619 F.2d 196, 200 (2d Cir. 1980)).  For example, such an inference may be drawn where the evidence presented demonstrates that a municipality failed to train its employees such that the failure "amounts to deliberate indifference to the rights of persons with whom the [municipal actor] comes into contact."[24] City of Canton v. Harris, 489 U.S. 378, 388 (1989).  However, "[t]he mere assertion that there exists such a policy or custom, absent specific allegations of fact tending to support such an inference, is insufficient." Batista v. City of New York, No. 05-CV-8444, 2007 U.S. Dist. LEXIS 71905, at *14 (S.D.N.Y. Sept. 24, 2007) (citing Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993)).  Moreover, "allegations of a single, isolated, incident of [municipal] misconduct will not suffice" for purposes of demonstrating the existence of a municipal policy. Aguilera v. County of Nassau, 425 F. Supp. 2d 320, 324 (E.D.N.Y. 2006); see also Dwares, 985 F.2d at 100 ("A single incident

---

[24]  Although a failure to train theory of municipal liability is briefly mentioned by the parties in their motion papers, plaintiff does not appear to be pursuing a Monell claim based on this theory of liability.  Rather, plaintiff's Complaint and motion papers primarily focus on the custom or policy theory of municipal liability.  Moreover, there is no evidence of a failure to train based on the record herein.

alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy.").

A.    The Village Defendants

Plaintiff alleges that the "[d]efendants have consistently sought to silence persons like Plaintiff and to engage in actions and abuses which violate and deny employee's their [constitutional] rights . . . by conditioning employment, terms of employment, promotions and stated roles, on employees not speaking publicly against and opposing improper and wrongful actions by Defendants . . . ."  (Compl. ¶ 95.)  Put simply, plaintiff alleges that defendants created a custom or policy of retaliating against employees - through harassment and termination - for exercising their First Amendment rights.

However, plaintiff has failed to present any evidence beyond his own isolated experience. There is nothing in the evidence submitted from which the Court could conclude that any other police officers within the RVCPD experienced anything similar to plaintiff's allegations, such that an informal custom of retaliation could be inferred.  "A single, isolated incident . . . does not suffice to show a municipal custom."  Nichols v. Village of Pelham Manor, 974 F. Supp. 243, 259 (S.D.N.Y. 1997) (citing City of Canton, 489 U.S. at 387) (additional citation omitted); see also Annunziata v. City of New York, No. 06 Civ. 7637, 2008 U.S. Dist. LEXIS 42097, at *14-15 (S.D.N.Y. May 28, 2008) (dismissing Monell claim where only evidence offered was an isolated incident specific to plaintiff).  "[F]or a plaintiff's claim of custom or policy to survive summary judgment review, there necessarily must be evidence of the complained-of activity by defendants in similar circumstances outside of the present case."  Jeanty v. County of Orange, 379 F. Supp. 2d 533, 545 (S.D.N.Y. 2005) (citing Ricciuti, 941 F.2d at 122); see also Davis v.

City of Hartford, 601 F. Supp. 2d 488, 493 (D. Conn. 2009) (granting summary judgment to defendant on Monell claim where plaintiff's "basis for imposing municipal liability focus[ed] on only the circumstances of her particular case"); McAllister v. N.Y. City Police Dep't, 49 F. Supp. 2d 688, 706-07 (S.D.N.Y. 1999) (granting summary judgment to defendants for lack of a custom or policy where plaintiff "point[ed] only to his own alleged beating, false arrest and denial of medical treatment and the Police Department's alleged conspiratorial 'cover-up' as evidence of a New York City policy"); Longin v. Kelly, 875 F. Supp. 196, 200 (S.D.N.Y. 1995) ("The law thus requires . . . that a plaintiff present some proof of municipal policy or custom evidenced by occurrences other than the incident that involved plaintiff.").  Plaintiff has offered no such evidence here and, accordingly, his Monell claim against the Village and the RVCPD should be dismissed.

Moreover, because plaintiff cannot demonstrate the existence of a municipal policy or custom, as discussed above, the Section 1981 and Section 1983 employment discrimination claims against the Village and the RVCPD fail as a matter of law.  Accordingly, summary judgment should be granted to the Village and the RVCPD with respect to plaintiff's claims for employment discrimination and municipal liability pursuant to 42 U.S.C. §§ 1981 and 1983.

With respect to plaintiff's Section 1981 and Section 1983 claims against Commissioner McKeon in his individual capacity, however, summary judgment is inappropriate.  Since employment discrimination claims brought pursuant to Sections 1981 and 1983 are analyzed the same as those brought under Title VII and the New York Human Rights Law, there remains a question of fact as to whether plaintiff engaged in protected activity, as he alleges - i.e., his

opposition to the alleged use of racial slurs by members of the RVCPD - for which he was retaliated against in the form of his termination by McKeon.

McKeon has asserted the defense of qualified immunity, which shields a government official from civil liability resulting from the performance of his discretionary functions where his conduct "did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003) (citing Lewis v. Cowen, 165 F.3d 154, 166-67 (2d Cir. 1999)). However, "[w]here specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate." Mandell, 316 F.3d at 385 (citing cases). Here, retaliatory intent is an element of plaintiff's Section 1981 and Section 1983 employment discrimination claims and there is a triable issue of fact with respect to that element - i.e., whether plaintiff's protected speech, if found to have taken place, was the motivating factor for McKeon's decision to terminate him. Accordingly, "[u]ntil that issue is resolved by a factfinder . . . the retaliation claim against [McKeon] cannot be dismissed on qualified immunity grounds." Id.; see also Morgenstern v. County of Nassau, No. 04-CV-0058, 2008 U.S. Dist. LEXIS 91746, at *52 (E.D.N.Y. Sept. 29, 2008) (stating that "granting summary judgment based on qualified immunity is improper if genuine issues of material fact exist"); Szoke v. Carter, 974 F. Supp. 360, 369 (S.D.N.Y. 1997) ("Because facts material to this inquiry, namely the factual question behind [defendant's] actions, are in dispute, the Court cannot make a qualified immunity determination at this time.").

Accordingly, summary judgment should be denied with respect to plaintiff's Section 1981 and Section 1983 claims against Commissioner McKeon, in his individual capacity.

B.     Sergeant Burke

For the same reasons that summary judgment should be denied with respect to plaintiff's Section 1981 and Section 1983 claims against Commissioner McKeon, as well as the analysis with respect to plaintiff's New York Human Rights Law claim against Sergeant Burke, discussed supra, I recommend that Sergeant Burke's motion for summary judgment as to plaintiff's claims pursuant to 42 U.S.C. §§ 1981 and 1983 be denied.

C.     The CSC

With respect to plaintiff's Section 1981 and Section 1983 claims against the CSC, plaintiff has failed to allege or offer evidence of any policy or custom of the CSC, including one of denying reinstatement to individuals who complained about discrimination.  In fact, plaintiff does not even address his municipal liability claim against the CSC in his opposition to the CSC's motion for summary judgment.  Accordingly, the CSC's motion for summary judgment with respect to plaintiff's Monell claim should be granted.  Since plaintiff cannot establish any custom or policy on the part of the CSC, his Section 1981 and Section 1983 employment discrimination claims against the CSC fail as well.

For the foregoing reasons, the CSC's motion for summary judgment should be granted with respect to plaintiff's employment discrimination claims pursuant to 42 U.S.C. §§ 1981 and 1983 as well as his Monell claim.

VII.    <u>First Amendment Retaliation</u>

To establish a First Amendment retaliation claim under Section 1983, a public employee must demonstrate the following: (1) the speech at issue was protected; (2) he suffered an adverse employment action; and (3) "the speech at issue was a substantial or motivating factor in the adverse employment action." <u>Benvenisti v. City of New York</u>, No. 04 Civ. 3166, 2006 U.S. Dist. LEXIS 73373, at *21-22 (S.D.N.Y. Sept. 23, 2006) (citing cases); <u>see also</u> <u>Healy v. City of New York</u>, No. 04 Civ. 7344, 2006 U.S. Dist. LEXIS 86344, at *11 (S.D.N.Y. Nov. 22, 2006) (citing cases).

In determining whether a public employee's speech is protected, courts must engage in a two-part inquiry. <u>See</u> <u>Healy</u>, 2006 U.S. Dist. LEXIS 86344, at *12 (<u>citing</u> <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418 (2006)). First, a court must determine "whether the employee spoke as a citizen on a matter of public concern." <u>Garcetti</u>, 547 U.S. at 418 (<u>citing</u> <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968)). Speech is considered protected where it pertains to a "matter of political, social or other concern to the community." <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983)). However, "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment falls outside the realm of constitutional protection." <u>Benvenisti</u>, 2006 U.S. Dist. LEXIS 73373, at *32 (internal quotation marks and citations omitted). Moreover, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes," <u>Garcetti</u>, 547 U.S. at 421, and "the First Amendment does not protect the employee's speech from discipline or retaliation by the employer." <u>Weintraub v. Bd. of Educ.</u>, 489 F. Supp. 2d 209, 219 (E.D.N.Y. 2006). "The inquiry into the protected status of speech is one of law, not fact." <u>Benvenisti</u>, 2006

U.S. Dist. LEXIS 73373, at *24 (quoting Connick, 461 U.S. at 148 n.7); see also Lewis, 165

F.3d at 163 ("Whether an employee's speech addresses a matter of public concern is a question

of law for the court to decide . . . .").

If the answer to the first part of the inquiry is no and the employee's speech is found to

be of a private matter rather than a public one, "the employee has no First Amendment cause of

action based on his or her employer's reaction to the speech." Garcetti, 547 U.S. at 418 (citing

Connick, 461 U.S. at 147). However, if the answer is yes, the court must "move to the second

part of the test, questioning 'whether the relevant government entity has an adequate justification

for treating the employee differently from any other member of the general public.'" Healy,

2006 U.S. Dist. LEXIS 86344, at *12 (quoting Garcetti, 547 U.S. at 418). This requires the

court to arrive "at a balance between the interests of the [employee], as a citizen, in commenting

upon matters of public concern and the interest of the State, as an employer, in promoting the

efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568

(commonly referred to as the "Pickering balancing test"); see also McEvoy v. Spencer, 124 F.3d

92, 98 (2d Cir. 1997) (holding that the ultimate question is whether the employee's right to speak

is outweighed by the public employer's interest in the effective operation of the workplace).

This, too, is an issue of law for the court to decide. See Lewis, 165 F.3d at 164 ("[I]t is the

court's task to apply the [balancing test] to the facts.") (alteration in original); Mataraza v.

Newburgh Enlarged City Sch. Dist., 294 F. Supp. 2d 483, 487 (S.D.N.Y. 2000) ("It is the Court,

not the jury, that performs the Pickering balancing test.").

In conducting the Pickering balancing test, "a court must consider whether the statement

sought to be protected 'impairs discipline by superiors or harmony among co-workers, has a

detrimental impact on close working relationships . . . or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" Lewis, 165 F.3d at 162 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)); see also Rookard v. Health and Hosps. Corp., 710 F.2d 41, 46 (2d Cir. 1983) ("A] court should consider whether the speech impaired the employee's ability to perform his duties, disrupted working relationships requiring personal loyalty and confidence, or otherwise impeded the regular operation of the employing agency."). Additionally, the "manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." Rankin, 483 U.S. at 388; see also Lewis, 165 F.3d at 162. The government bears the burden of demonstrating that the challenged speech threatens to interfere with its operations. See Lewis, 165 F.3d at 162. However, the government is only required to show a "likely interference with its operations, . . . not an actual disruption." Id. at 163 (internal quotation marks and citations omitted); see also Mataraza, 294 F. Supp. 2d at 488 (rejecting plaintiff's argument that the defendant must demonstrate that his speech actually disrupted the workplace).

Finally, under the Pickering balancing test, speech charging unlawful, fraudulent, or corrupt conduct carries great weight. See Rookard, 710 F.2d at 46; Benvenisti, 2006 U.S. Dist. LEXIS 73373, at *31 ("Allegations of public corruption or wrongdoing are almost always matters of public concern."). "An employee's charge of unlawful conduct is given far greater weight than is a complaint as to the fairness of internal office operations." Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 140 (2d Cir. 1999) (citing Connick, 461 U.S. at 148-49) (additional citations omitted). "A public employer cannot, with impunity, fire an employee who 'blew the whistle' on other employees' violations of law on the ground that those

disclosures impaired office morale."  Dangler, 193 F.3d at 140 (citing Frank v. Relin, 1 F.3d 1317, 1331 (2d Cir. 1993)).

      A.      The Village Defendants and Sergeant Burke

As an initial matter, there is a question of fact with respect to whether plaintiff engaged in any speech, protected or not.  As with plaintiff's retaliation claims, discussed supra, while plaintiff alleges that he complained to various supervisors concerning the use of racial slurs within the RVCPD, defendants categorically deny that plaintiff ever made any such complaints.  Assuming arguendo that plaintiff did make numerous complaints, as he alleges, I find that such speech would be protected as a matter of law.  Viewing the facts in the light most favorable to plaintiff, as the Court must, it is clear that any such complaints made by plaintiff pertained to "matter[s] of political, social or other concern to the community."  Connick, 461 U.S. at 146.  Plaintiff was not expressing dissatisfaction with his working conditions, such that his speech would be considered private.  See Benvenisti, 2006 U.S. Dist. LEXIS 73373, at *32.  Rather, he was opposing discriminatory language used in the presence of a minority co-worker and, more broadly, discriminatory language being used to describe minority members of the community.  Such speech is clearly protected.

In addition, the Village Defendants have offered nothing to demonstrate that plaintiff's speech had any detrimental impact on or interfered in any way with the RVCPD's operations, such that they would be justified in terminating plaintiff.  Since plaintiff's speech addressed allegedly unlawful conduct by members of the RVCPD, the Pickering balancing test falls in plaintiff's favor.

However, there is an issue of fact with respect to whether plaintiff's speech was a substantial or motivating factor in the decision to terminate him.  <u>See</u> <u>Benvenisti</u>, 2006 U.S. Dist. LEXIS 73373, at *21-22.  While plaintiff has offered considerable testimony detailing the numerous complaints he made and the alleged retaliation he suffered as a result, the Village Defendants deny receiving any such complaints and Sergeant Burke denies engaging in the offensive language or retaliating against plaintiff in any way.  Accordingly, there is a question of fact with respect to the motivation behind plaintiff's termination, which precludes summary judgment.  <u>See</u> <u>Piesco v. Kock</u>, 12 F.3d 332, 342 (2d Cir. 1993) ("The second element, the employer's motivation, presents a question of fact."); <u>Anderson v. New York</u>, No. 07 Civ. 9599, 2009 U.S. Dist. LEXIS 36029, at *67 (S.D.N.Y. Apr. 27, 2009) (denying summary judgment where there was a question of fact "as to whether plaintiff [had] shown a causal connection between her protected speech and her discharge").

Based on the foregoing, I recommend that the Village Defendants' and Sergeant Burke's motions for summary judgment with respect to plaintiff's First Amendment retaliation claim be denied.

B.     <u>The CSC</u>

With respect to the CSC, however, plaintiff has offered no evidence to establish that the CSC was even aware of his protected speech, let alone refused to reinstate him to the civil service list as a result of it.  For the reasons discussed <u>supra</u> in connection with plaintiff's New York Human Rights Law claim against the CSC, I recommend that the CSC's motion for summary judgment be granted as to plaintiff's First Amendment retaliation claim.

VIII.    The Section 1983 Due Process Claim

To prevail on a claim for a violation of due process under Section 1983, a plaintiff must establish that "a government entity deprived [him] of a right secured by law."  Finley v. Giacobbe, 79 F.3d 1285, 1296 (2d Cir. 1996) (citing Gomez v. Toledo, 446 U.S. 635, 640 (1980)) (additional citation omitted).  Accordingly, a plaintiff must demonstrate that he "possessed a protected liberty or property interest, and that he was deprived of that interest without due process."[25]  McMenemy, 241 F.3d at 286 (quoting Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir. 1998)).

Since the Constitution does not create property interests, courts must look to "existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  "To have a property interest in a

---

[25]  I find that the facts herein do not rise to the level necessary to sustain an action for deprivation of a liberty interest.  To prevail on such a claim, known as a "stigma-plus claim," a plaintiff is required to prove an "injury to [his] reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process."  Segal v. City of New York, 459 F.3d 207, 212 (2d Cir. 2006) (quoting DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003)).  The "stigma" component of such a claim requires plaintiff to prove three elements: (1) "that the government made stigmatizing statements about [him] - statements that call into question [the] plaintiff's good name, reputation, honor, or integrity," or that "denigrate the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession;" (2) that "these stigmatizing statements were made public;"and, (3) that "the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment."  Segal, 459 F.3d at 212 (quotations omitted).  After reviewing all of the evidence submitted in connection with the within motions, I do not find that any of the statements made by the defendants regarding plaintiff's abilities as a police officer or in connection with his termination satisfy the first element necessary to establish that plaintiff was stigmatized.  Accordingly, the analysis of plaintiff's due process claim focuses solely on whether plaintiff was deprived of a property interest.

benefit, a person clearly must have more than an abstract need or desire for it . . . or a unilateral expectation of it." Id. Rather, he must have a "legitimate claim of entitlement to it . . . ." Id

It is well-settled under New York law that "a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any stated specific reason." Finley, 79 F.3d at 1297 (quoting Meyers v. City of New York, 622 N.Y.S.2d 529, 532 (2d Dep't 1995)); see also Fitzgerald v. Feinberg, No. 98 Civ. 8885, 1999 U.S. Dist. LEXIS 12584, at *9 (S.D.N.Y. Aug. 11, 1999) ("Probationary or at-will employees lack a 'legitimate claim of entitlement,' and therefore lack a property interest in the expectation of continued employment."). It is undisputed here that plaintiff was a probationary employee, who was terminable at will, with or without just cause. Accordingly, plaintiff did not possess a legally protectible property interest in his employment with the RVCPD.

Plaintiff tries to circumvent this fact by arguing that the property interest he was deprived of was not his continued employment with the RVCPD, but rather, the right to a non-discriminatory probationary period and the "right not to have his probationary period terminated, based on any bad faith, constitutionally impermissible reason, or in violation of statutory law." (Pl. Mem. of Law in Opp'n to Village Def. Mot. 21.) Plaintiff asserts that such a right is guaranteed to him by New York state law, as well as the RVCPD's policies and the Collective Bargaining Agreement between the Village and the PBA. (Id.)

As discussed in further detail below in connection with plaintiff's breach of contract claim, plaintiff is not subject to the rights pertaining to discharge and discipline contained in the Collective Bargaining Agreement and therefore cannot base a property interest on that

Agreement.  Moreover, while state and federal law may provide a right to a non-discriminatory workplace and the right not to be discharged as a result of discrimination, such a right does not create a legally protectible property interest.  See McMenemy, 241 F.3d at 288 (affirming dismissal of due process claim and stating that "the fact that state law creates a right to non-discriminatory consideration for a discretionary promotion does not create a property interest"); Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 629-30 (2d Cir. 1996) (stating that while "a discharge motivated by an unconstitutional reason . . . would be impermissible whatever the terms of [plaintiff's] employment . . . these constitutional constraints . . . do not create a property interest"); White v. Dep't of Corr. Servs., No. 08 Civ. 0993, 2009 U.S. Dist. LEXIS 26488, at *14 (S.D.N.Y. Mar. 28, 2009) ("[A]n allegation of . . . discrimination alone, without more, does not support a procedural due process claim for employment discrimination."); Pierce v. Netzel, No. 98 Civ. 532A(F), 2004 WL 1055959, at *7 (W.D.N.Y. May. 10, 2004) ("No claim for employment discrimination lies under § 1983 based on a due process violation unless the plaintiff had a protectable interest in continued employment.").

Accordingly, since plaintiff cannot establish a protected property interest, his Section 1983 claim for a procedural due process violation fails as a matter of law.  In addition, to prevail on a claim for a substantive due process violation, plaintiff must demonstrate that the government action he challenges - here, plaintiff's termination - was "arbitrary, conscience shocking, or oppressive in a constitutional sense."  Pisello v. Town of Brookhaven, 933 F. Supp. 202, 214 (E.D.N.Y. 1996) (quoting Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995)).  Substantive due process does not protect against government action that is "incorrect or ill-advised," Kaluczky, 57 F.3d at 211, and only a "group of rare claims [are] afforded protection

under the doctrine of substantive due process." Pisello, 933 F. Supp. at 214 (citing Local 342, Long Island Pub. Serv. Employees v. Town Bd., 31 F.3d 1191, 1196 (2d Cir. 1994)).  The actions complained of by plaintiff herein do not satisfy the standard for substantive due process protection.

Based on the foregoing, I recommend that all of the defendants be granted summary judgment with respect to plaintiff's 42 U.S.C. § 1983 claim for denial of due process.


IX.    Title VI

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  "[F]or a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment."  Association Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 276 (2d Cir. 1981) (citing cases); Johnson v. County of Nassau, 411 F. Supp. 2d 171, 175 (E.D.N.Y. 2007) (same).

Here, plaintiff alleges that the "Village and/or [the RVCPD] receives federal financial assistance, which, in part, is aimed at employment."  (Compl. ¶ 70.)  However, plaintiff has failed to offer any evidence whatsoever to support his claim that the Village Defendants received federal funds aimed at employment during the time that plaintiff was employed with the RVCPD, thereby subjecting them to potential liability under Title VI.  Rather, the Village

Defendants have submitted an affidavit from the Grants Manager of the Village, Frank Keating ("Keating"), who states that he "reviewed all of the records of [the Village] for the period March 2002 through August 2003 pertaining to Federal grants received by [the Village]," and "determined that no grants had been received by [the Village] during that period which involved federal money used for employment purposes." (Keating Aff., Apr. 22, 2008, ¶ 2.) Plaintiff has offered nothing to refute Keating's affidavit.[26] The conclusory allegation contained in plaintiff's Complaint does not suffice to survive summary judgment. See Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.").

For the foregoing reasons, I recommend that the Village Defendants' motion for summary judgment be granted with respect to plaintiff's Title VI claim.[27]

X.     Breach of Contract

Plaintiff alleges that the Village Defendants breached the duties owed to him under an express or implied contract "by allowing its employees and agents to commit blatant callous

---

[26] Plaintiff does not even discuss his Title VI claim in his opposition to the Village Defendants' motion for summary judgment.

[27] The Village Defendants also correctly assert that Commissioner McKeon cannot be held liable under Title VI. See Folkes v. N.Y. College of Osteopathic Med., 214 F. Supp. 2d 273, 292 (E.D.N.Y. 2002) (stating that "Title VI claims cannot be asserted against an individual defendant"); see also Goonewardena v. New York, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007); Rodriquez v. New York Univ., No. 05 Civ. 7374, 2007 WL 117775, at *6 (S.D.N.Y. Jan. 16, 2007). As with the Title VII claim, plaintiff's Complaint does not appear to name McKeon in his Title VI cause of action. However, to the extent that any such claim is alleged against McKeon, the Village Defendants' should be granted summary judgment with respect to that claim as well.

discriminatory acts, while failing to prevent and/or protect the plaintiff when he opposed said acts." (Compl. ¶ 79.) Plaintiff further alleges that the Village Defendants breached the duties owed to him "by retaliating against, mistreating and creating a hostile working environment for [him], when attempting to protect his rights." (Compl. ¶ 79.) It is undisputed that plaintiff did not have an employment contract with the RVCPD or the Village. Rather, plaintiff bases his breach of contract claim on the RVCPD Rules and Regulations, as well as the Collective Bargaining Agreement between the Village and the PBA. (Compl. ¶ 76.) According to plaintiff, the "terms and statements contained in the [RVCPD] Rules and Regulations and the Collective Bargaining Agreement created an expressed and implied contract . . . that Defendants would not unlawfully discriminate, retaliate or abuse the plaintiff during his employment relationship with respect to [their] personnel decisions." (Compl. ¶ 76.)

Pursuant to New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Gutt v. Nassau Health Care Corp., No. 04CV57, 2005 U.S. Dist. LEXIS 38775, at *15 (E.D.N.Y. Mar. 15, 2005) (quoting First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998)). Plaintiff cannot satisfy the first element necessary to sustain a cause of action for breach of contract, i.e., the existence of a contract.

The Rules and Regulations of the RVCPD specifically state that a probationary employee may be terminated without a hearing, if the "conduct, services, performance of duty, physical condition, or health [of the probationary police officer] becomes unsatisfactory at any time during the probationary period." (Village Def. Ex. U.) This is, in effect, the very definition of "at will" employment, for which no breach of contract action can lie. See Hargett v. MTA, 552

F. Supp. 2d 393, 402-03 (S.D.N.Y. 2008) (stating that "New York law generally does not recognize contract liability in at-will employment relationships," which are defined as "employment for an indefinite or unspecified term . . . freely termina[ble] by either party at any time without cause or notice"). In addition, the Rules and Regulations expressly exempted probationary employees from the provisions of the Collective Bargaining Agreement with respect to discipline and discharge by stating that probationary employees "may be disciplined or discharged by the Village in its sole discretion without recourse to the grievance and arbitration provisions contained in the contractual agreement between the Village and the Police Benevolent Association." (Village Def. Ex. U.) Plaintiff does not dispute the existence of these rules or that he was not entitled to pursue the grievance and arbitration provisions of the Collective Bargaining Agreement. Accordingly, plaintiff cannot base a breach of contract claim on either the Collective Bargaining Agreement or the RVCPD Rules and Regulations.

In some instances, an implied contract may be found to exist where there are "[p]olicies in a personnel manual specifying the employer's practices with respect to the employment relationship, including the procedures and grounds for termination . . . ." Baron v. Port Auth., 271 F.3d 81, 85 (2d Cir. 2001) (citing cases). However, in order to establish that such policies imply an employment contract, the employee must demonstrate that "(1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment." Baron, 271 F.3d at 85 (citing Lobosco v. New York Tel., 96 N.Y.2d 312, 316 (2001)). "The New York Court of Appeals has admonished that this is a 'difficult pleading burden,' . . . and that 'routinely issued

employee manuals, handbooks and policy statements should not <u>lightly</u> be converted into binding employment agreements." <u>Baron</u>, 271 F.3d at 85 (<u>quoting</u> <u>Lobosco</u>, 96 N.Y.2d at 317) (emphasis in original) (internal quotation omitted).

Here, plaintiff cannot establish the first element necessary to create an implied contract, <u>i.e.</u>, the existence of a written policy limiting the employer's right of discharge.  In fact, there is quite the opposite here in that the RVCPD Rules and Regulations expressly permit the discharge of a probationary employee for any reason whatsoever, without notice or cause.  (Village Def. Ex. U.)  Accordingly, plaintiff's claim of an implied contract based on the Rules and Regulations fails as well.

Finally, although not pleaded in his Complaint, in his opposition to the Village Defendants' motion for summary judgment, plaintiff asserts that the RVCPD's Affirmative Action/Equal Employment Policy Statement created the "express, written limitation on the defendant's right to discharge [plaintiff]," necessary to create an implied contract, as discussed above.  (Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J. 33.)  However, it is "well-established that an employer's anti-discrimination policies and manuals cannot serve as the basis for a breach of contract claim."  <u>Davis</u>, 2006 WL 657038, at *15; <u>see also</u> <u>Radin v. Albert Einstein Coll. of Med.</u>, No. 04 Civ. 704, 2005 U.S. Dist. LEXIS 9772, at *36 n.18 (S.D.N.Y. May 20, 2005) (finding that plaintiff's breach of contract claim based on school's anti-discrimination policy was invalid "because broad pronouncements of . . . compliance with existing anti-discrimination laws, promising equitable treatment . . . cannot form the basis for a breach of contract claim").  "[A] general statement of equal opportunity and nondiscrimination contained in an employee handbook is nothing more than a statement of existing law concerning

discrimination, [and] may not serve as a basis for a breach of contract claim." Davis, 2006 WL 657038, at *15 (quoting Blaise-Williams v. Sumitomo Bank, Ltd., 592 N.Y.S.2d 41, 42 (1st Dep't 1993)).

Based on the foregoing, I recommend that the Village Defendants' motion for summary judgment be granted as to plaintiff's breach of contract claim.


RECOMMENDATION

For the foregoing reasons, I recommend as follows: (1) that the Village Defendants' motion for summary judgment be granted in part and denied in part; (2) that Sergeant Burke's motion for summary judgment be granted in part and denied in part; and (3) that the Civil Service Commission's motion for summary judgment be granted in its entirety and that all claims against it be dismissed.[28]

Specifically, I recommend that the following claims be dismissed: (1) the Title VI claim in its entirety; (2) the 42 U.S.C. §§ 1981 and 1983 employment discrimination claims against the Village, the RVCPD and the CSC; (3) the due process claim pursuant to 42 U.S.C. § 1983 in its entirety; (4) the municipal liability claim in its entirety; (5) the First Amendment retaliation claim against the CSC; (6) the New York Human Rights Law claim against the CSC; (7) the breach of contract claim against the Village Defendants; and (8) all official capacity claims against Commissioner McKeon and Sergeant Burke. In addition, to the extent any Title VII claim is asserted against Commissioner McKeon, it too should be dismissed. Lastly, although

---

[28] Since I recommend that the CSC's motion for summary judgment be granted in its entirety, there is no need to reach the issue raised in the parties' motion papers of whether the CSC is a suable entity.

not raised by the Village Defendants, the RVCPD is not a suable entity.[29]  Any claims against the RVCPD should therefore be dismissed.

Accordingly, the following claims should remain and proceed to trial: (1) the Title VII claim against the Village; (2) the New York Human Rights Law claims against the Village, Commissioner McKeon and Sergeant Burke; (3) the First Amendment retaliation claims against the Village, Commissioner McKeon and Sergeant Burke; and, (4) the 42 U.S.C. §§ 1981 and 1983 claims for employment discrimination against Commissioner McKeon and Sergeant Burke. Any claims asserted against Commissioner McKeon and Sergeant Burke are solely in their individual capacities.

OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within ten (10) days of receipt of this report.  Failure to file objections within ten (10) days will preclude further appellate review of the District Court's order.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), and 72(b); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822 (1994); Frank v.

---

[29]  "Under New York law, departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued."  Hall v. City of White Plains, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) (dismissing claims against White Plains  Department of Public Safety where claims also asserted against municipality); see also Fanelli v. Town of Harrison, 46 F. Supp. 2d 254, 257 (S.D.N.Y. 1999) (dismissing claims against police department where municipality, as the "real party in interest," was named as well); Wilson v. City of New York, 800 F. Supp. 1098, 1101 (E.D.N.Y. 1992) ("The court also dismisses the claims against the New York City Police Department, which cannot be sued independently because it is an agency of the City of New York.").

Johnson, 968 F.2d 298 (2d Cir. 1992), cert. denied, 506 U.S. 1038 (1992); Small v. Sec'y of

Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).


**SO ORDERED:**

Dated: Central Islip, New York
      August 5, 2009

                                    /s/ E. Thomas Boyle
                                    HON. E. THOMAS BOYLE
                                    United States Magistrate Judge